ST. LOUIS & S. F. R. CO. v. HADLEY, Atty. Gen., et al. (and seventeen other cases).

(Circuit Court, W. D. Missouri, March 8, 1909. Supplemental Opinion, April 17, 1909.)

Nos. 2,988–3,004, 3,006.

1. COURTS (§ 489*)—FEDERAL COURTS—CONCURRENT JURISDICTION—COMITY.

The federal courts should not decline on the ground of comity to take jurisdiction of a suit in equity involving rights under the Constitution of the United States, where its determination depends upon questions of fact, since, if brought in a state court, the case can only be reviewed by

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the Supreme Court of the United States on writ of error, where findings of fact made by the state court are conclusive.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 1324–1341; Dec. Dig. § 489.*]

2. COMMERCE (§ 61*)—MEANS OF REGULATION—CONSTITUTIONALITY OF STATE STATUTE REGULATING RATES—INTERSTATE COMMERCE.

State statutes fixing maximum fares and rates on shipments on railroads between points within the state are not unconstitutional, as regulations of interstate commerce, because of the fact that between certain cities in the state there are lines of road lying wholly within the state, and other lines which run in part through another state, and by long-established custom and from the necessities of competition the latter are compelled to make the same rates as the former, where the statutes have not been construed by the courts of the state to directly apply to the interstate lines.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 61.*]

3. CARRIERS (§ 12*)—STATE REGULATION OF RATES—VALIDITY OF STATUTE.

It is not a ground for holding state statutes fixing maximum railroad rates invalid that they have been the cause of the discharge of a large number of railroad employés.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

4. CARRIERS (§ 12*)—STATE REGULATION OF RATES—VALIDITY OF STATUTE.

The fact that state statutes fixing railroad rates are not enforceable as to particular railroads, because the rates as applied to such roads are not compensatory, does not render them invalid as to other roads.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

5. CARRIERS (§ 12*) — STATE REGULATION OF RATES — VALIDITY OF STATUTE— REASONABLENESS OF RATES.

In determining the reasonableness of freight and passenger rates established by a state on intrastate railroad traffic, as applied to a railroad during both interstate and intrastate business, the difference in the cost of handling each kind of business as related to the earnings from each should be taken into account, and in apportioning the total expenses between the two kinds of business the most logical and satisfactory method is to make the division on the basis of the relative earnings from each kind and class of business.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

6. CONSTITUTIONAL LAW (§ 47*)—DETERMINATION OF VALIDITY—STATE REGULATION OF RATES—VALIDITY OF STATUTE.

In the determination by a court of the constitutionality and validity of railroad rate statutes of a state, the question of the consideration given to the subject by the Legislature before their passage is wholly immaterial.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 47.*]

7. CARRIERS (§ 26*)—STATE REGULATION OF RATES—REASONABLENESS OF RATES —STATE AND INTERSTATE BUSINESS.

In determining whether a state statute regulating railroad rates is confiscatory with respect to a given railroad company doing both interstate and intrastate business, the only question is whether its earnings under such rates from its intrastate business, after deducting the expenses properly chargeable thereto, are remunerative, taking its property within the state at a fair valuation, and its earnings from interstate or outside business are immaterial.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 26.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. CARRIERS (§ 12*) — STATE REGULATION OF RATES — VALIDITY OF STATUTE — REASONABLENESS OF RATES.

Railroad property, properly built and properly managed, is entitled to earn an annual income of 6 per cent. on its fair valuation, and a statute fixing rates under which it cannot make such income is confiscatory and unconstitutional.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

9. CARRIERS (§ 12*) — STATE REGULATION OF RATES — VALIDITY OF MISSOURI STATUTES.

Act Mo. Feb. 27, 1907 (Laws 1907, p. 170), establishing two cent passenger fares on railroads within the state, and Act March 19, 1907 (Laws 1907, p. 171), establishing maximum freight rates, *held* confiscatory and unconstitutional on evidence showing that none of the railroads doing business thereunder can earn to exceed 3 per cent. net income on its state business under such rates, while as to some the business must be done at a loss.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

10. COSTS (§ 60*)—DISCRETION OF COURT IN EQUITY—DIVISION OF COSTS.

In an equity suit the award of costs is discretionary, and where, through the faults of both parties, an unnecessarily large and expensive record has been made, the costs will be divided as seems equitable.

[Ed. Note.—For other cases, see Costs, Cent. Dig. § 264; Dec. Dig. § 60.*]

11. CONSTITUTIONAL LAW (§ 55*) — STATUTES (§ 64*) — STATE REGULATION OF RATES—VALIDITY OF STATUTE—EXCESSIVE PENALTIES.

The penalty provision of the Missouri two-cent passenger fare statute of February 27, 1907 (Laws 1907, p. 170), which imposes a fine for each violation of not less than $100 nor more than $500, and that of the freight rate statute of March 19, 1907 (Laws 1907, p. 171), which imposes a fine for its violation of not more than $5,000, are both void because of the excessive penalties provided, as an indirect attempt to preclude the railroad companies from litigating in the courts the question of the reasonableness of the rates, which is a judicial question; but, such provision in each case being separable from the remainder of the statute, its invalidity does not render the other provisions invalid.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 55;* Statutes, Cent. Dig. § 58; Dec. Dig. § 64.*]

See, also, 155 Fed. 220; 161 Fed. 419.

Prior to the argument, the court requested counsel on both sides to submit requests for findings of fact. Complainants' counsel did this. Defendants' counsel have not done so. Complainants' requests have been considered, some of which are embodied within the following findings, and some are not.

The following are the findings of fact that the court makes as based upon the evidence herein:

(1) The complainants are the 18 railroad companies owning and operating lines of railroad in Missouri, they doing all of the state and interstate railroad business therein, and all of them except the St. Louis & Hannibal Company having lines of railroad both within and without the state. That company is wholly within the state, extending from Hannibal, Mo., to the south 120.61 miles. The Kansas City, Clinton & Springfield Company is a road of about 160 miles in length, with 151.01 miles in the state. All the other companies have lines extending into a number of other states, one of them extending into 13 other states and territories. These roads, with their own lines and with their connecting carriers, carry all the traffic and do all the business, freight and passenger, within the state, whether of state or interstate character. The intrastate business is at all times herein referred to as "state business." That part of the interstate business which neither originates within, nor has its destination within, but passes across the state of Missouri, is called "transstate business."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

(2) The same roadbed, locomotives, cars, and trains, including all facilities, are used for both classes of business, state and interstate. It is not practicable to conduct the business in any other way. This is so both from the standpoint of the public and that of the companies. If state business were to be carried alone upon some cars and trains, and interstate alone upon others, the expenses would be enormously increased, and almost if not quite prohibitive, while the public would be subjected to delays, inconveniences, and great expense. By reason of all this the business cannot practicably be separated.

(3) Both from a geographical and railway standpoint, Missouri is situated differently from the other states of the Union, there only being two or three other states that have a resemblance to it in these particulars, and each of them in a lesser degree. This is so because the Mississippi is its boundary on the east all the distance. From a railroad standpoint, the Missouri river is its boundary line on the west, although physically the Missouri river is only the western boundary line from the northwest corner of the state about halfway to the southwest corner. But at the halfway point, namely, Kansas City, the river turns directly to the east, and continues its way to the Mississippi river. In its production, business, and commerce all that part of Missouri to the north of the Missouri river is practically like the south half of Iowa, the country districts producing large quantities of live stock and grain for the market, as well as much bituminous coal. The south half of Missouri is entirely different. The amount of grain and live stock is much less than in the north half of the state. But the south half has a large amount of timber, stone, lime, lead, zinc, iron, and fruits. St. Louis on the east is a city of nearly 1,000,000 people, Kansas City on the west nearly half as many, while St. Joseph has more than 125,000 people. These three cities carry on large manufacturing interests. The grain, live stock, and packing-house interests at Kansas City and St. Joseph are enormous. For a third of a century or more, for reasons which need not be repeated, rates from the East were fixed to the Mississippi river, and, later on, from thence to the Missouri river. The interstate rates either in or out were the one plus the other. It was the same from the West. It was likewise the same for the transstate business going in either direction. Such is the method existing to-day. This brought about the fact, which for years has existed and exists to-day, that the short line of road between the two rivers fixes the freight rates. To illustrate, the Burlington Road is the short line between the rivers, being 198 miles from Hannibal to St. Joseph, and the same distance, within a few miles, to Kansas City. The roads between Kansas City and St. Louis—and there are four, at least, of them—including the Burlington, is an average distance of nearly 300 miles, but some of the roads being 50 miles or more farther between the points than the others. This brings about the fact that all freight rates between any one point on the one river and any point on the other river are the same as the rate from Hannibal to St. Joseph over the Burlington Line. That is to say, the freight rates on any road, regardless of distance, are the same between St. Louis and either Kansas City or St. Joseph that they are between Hannibal and St. Joseph over the Burlington Line. This has given the three cities of St. Louis, Kansas City, and St. Joseph great advantages over other points. Competent persons say that to change this system will work irreparable harm to the three cities named, as well as to all other places within the state, by driving both the jobbing and manufacturing business to seaboard points. As to this, no finding is made nor opinion expressed, because it is believed to be a matter of policy upon which this court in these cases should express no opinion. As to the passenger rates, by reason of competition the fare is the same between Kansas City and St. Louis, the shorter line fixing the rates, thereby compelling the longer road to be at much expense without remuneration. This is likewise true as to all competitive points.

As to the foregoing question of rates and fares, there is no United States statute governing the same, and there is no Missouri statute upon the subject except the two statutes questioned by the bills, one dealing with certain commodities per car per distance, and the other fixing the passenger fares at two cents. Aside from these two statutes, and as to any bearing they have as to charges between the two rivers, the conditions named have been brought

about and exist to-day by reason of a long-time custom, and by reason of transportation, actual and probable, upon the two rivers.

Still further bearing on the question are the following facts: Joplin is a city in the southwestern part of the state, of more than 25,000 people. There are a number of towns adjacent thereto, giving that county (Jasper) a population of 200,000 people. It is a very large mining district of lead and zinc. Between Kansas City and Joplin three of complainants herein have railroads. The Missouri Pacific at all points between the said places is within the state. Each of the other two between said points is partly without the state, starting within and going out and coming back, thereby making it interstate business as to two of the roads between Kansas City and the Joplin district. Between Kansas City and St. Joseph, four roads do the business. The Missouri Pacific and Chicago Great Western is each part of the distance within the state of Kansas, while the Burlington and St. Joseph & Grand Island Company is each wholly within the state of Missouri between the two cities. Between St. Joseph and St. Louis two of complainants do practically all the business, which is very large in both passenger and freight. These are the Burlington and Missouri Pacific. Between said cities the Burlington Line is wholly within the state. But the Missouri Pacific line is partly within the state of Kansas, crossing the Missouri river at Atchison, and coming back into the state at Kansas City. On the foregoing facts the finding is that the short line between two competitive points necessarily fixes the rate, and the Missouri statutory rates under the statutes in question fix the rates between the cities named. But this is so solely because of the geographical location of cities and railroads, and competition, and long-time custom. It is not so either because of a statute or any judicial determination by any of the courts of Missouri.

(4) Pending this litigation, each of the complainant companies made and delivered to defendants statements showing the earnings and expenses for certain periods, which statements have been taken by both sides as sufficiently illustrative of the situation for the determination of these cases. The companies extended to the state officers, defendants herein, acting by experts by them selected, the opportunity to examine the statements and the books, papers, vouchers, and records of the companies. The freight rate statute of 1907 (Laws 1907, p. 170) as to commodities mentioned allowed greater rates than did the statute of 1905 (Laws 1905, p. 102 [Ann. St. 1906, § 1194]), assailed by the original bills of complaint herein, and it was conceded at the trial that, if the rates fixed by the act of 1907 were confiscatory, those fixed by the act of 1905 were likewise.

(5) The parties were producing evidence and preparing their evidence for about one year with the aid of experts on each side. These experts were all men of high character and great proficiency as railroad accountants. The experts on each side were given the fullest opportunity and all the time desired to obtain the information and put the same in form in exhibits, schedules, and reports, all of which are in evidence in the cases, supplemented by the oral testimony of each of the experts with reference to all of these things.

(6) It was conceded by the experts that the companies fairly, accurately, and honestly kept their books showing the facts in these findings set forth. The experts of the state and of the companies have thereby been enabled to present with certainty and precision all the earnings within the state, both state and interstate business. But obtaining and compiling this information by the experts has been at great expense of time and money. One exception to the foregoing is to be noted as to passenger fares for a short period of time after the two-cent fare law became operative. By agreement of both sides in open court in June, 1907, this court issued a temporary writ of injunction against the enforcement of the freight rate statute. The complainants asked for a temporary injunction against the enforcement of the two-cent passenger fare statute. This court held that the statute should be given a trial for five months and ascertain the result by actual operation. In preparing the order, counsel, no doubt by inadvertence, fixed three months as the period for trial as to results. But by acquiescence of both sides, or, if not, by delays with which the court was not chargeable, such status remained for more than one year, and the cases were not actually brought on for trial until in November,

168 F.—21

1908. But after the statute became operative in June, 1907, and this court denied the temporary writ of injunction, the interstate passenger rates remained as they were for a period of about two months. During the time that condition prevailed, parties both coming into and going out of Missouri on interstate journeys would buy tickets to the state line, thereby obtaining the benefit of the two-cent fare for all distance within the state. It was not possible for the companies to show the truth as to the number of such trips, and therefore it is not possible for the court to find just how much of the earnings were on account of such interstate trips. But the extent, whatever it was, would make an erroneous showing as to state earnings, though favorable to defendants, because such earnings were of an interstate character. But even though for the short time a part of the business was thus carried on so that additional earnings were erroneously placed to the credit of the state, still the results are not changed, for the error was against, and not in favor of, complainants.

Freight earnings, both state and interstate, are made up from earnings of transportation and another item called "miscellaneous freight," composed of switching, demurrage, and storage charges, and track and equipment rentals. Passenger earnings are made up of passenger fares and miscellaneous, the latter covering mail, express, excess baggage, storage, rentals, and possibly some other terminal earnings.

No difference of consequence has arisen between the parties as to the expense of doing the entire business in the state. With reasonable certainty the expenses for doing the freight and passenger, including miscellaneous of each, can be and have been separated.

The earnings are known and fixed, and in these findings stated to a certainty. But as to the expenses as between state and interstate business, there has been a controversy, and such is the principal controversy in the cases. There is no known fixed or certain rule for determining how this separation of expenses shall be made. The same cannot be made with mathematical certainty. Complainants claim that the division should be made upon the revenue basis; defendants claim that it should be made upon the ton mile basis for freight, and passenger mile basis for passengers, classifying the miscellaneous earnings as and with freight and passenger earnings respectively. By the revenue basis is meant to assign such proportion of the total expense in the state on that class of business as the earnings of that class of state business bear to all the earnings, state and interstate, from the same class, or, which is the same thing, ascertain what the percentage of all expenses is of all earnings, then multiply that by the state earnings of any class, and thus obtain the sum to be assigned as state expense. The ton mile basis as to freight means the assignment as state freight expenses of any class of business such proportion of all state expense as the number of ton miles of state freight bears to the total ton miles of all freight hauled within the state. By the passenger mile basis is meant the assignment as state passenger expenses such proportion of all passenger expenses as the number of passengers in state business carried one mile bears to the whole number of passengers, state and interstate, carried one mile.

For reasons stated in an opinion herein filed, the revenue basis has been and is adopted as the only logical basis to use in arriving at a correct conclusion. The one basis or the other as a whole must be adopted. Either side can make a better showing by adopting the one basis in part of the accounting, and the other basis for the other. Neither should be and is allowed to do this. As will presently appear, the state has attempted to do this in making its passenger earnings accountings.

(7) Each basis for accounting has some defects, but they are minor and not controlling, and do not change the result if the revenue basis is taken.

The expense of doing the state business over interstate is greater for carrying freight by at least 50 per cent., and at least 25 per cent. for carrying passengers. Therefore this extra cost must be added to the expenses after they have been ascertained so as to obtain the total expense. If the ton mile basis of division were adopted, the extra cost should also be added. This would require the use of another multiplier sufficient to bring the sum total of the state freight expense equal to that found herein, to actually represent

the cost as shown by the evidence. Any apportionment of passenger expense upon the passenger mile basis would be unfair and unjust, although much more favorable to the companies than if made upon the revenue basis.

(8) All things considered, the evidence shows the cost of doing the different classes of state business as between state and interstate apportioned upon the revenue basis with added extra cost brings a result in these findings stated which is fair and representative and just. The court finds, aside from the revenue basis, that the evidence shows the amount ascertained in each case as the expense and extra cost is fair, and justly represents the expense of doing each class of state business. The extra cost as to each complainant for doing the state business over interstate is more than 50 per cent. in case of freight, and more than 25 per cent. in case of passenger. This extra expense as thus found is considerably in excess of these figures, and the figures used are adopted as the minimum. The sum total of this extra cost, if ascertained according to the ton mile theory, would not be changed, because it is a question of multiplication, and one multiplier or another must be used accordingly as the theory is adopted. The findings herein made on all the evidence represent in dollars the fair cost and expense fixed at a minimum. There has also been considered and found in each case such sum as would equal the diminution of earnings upon the commodities covered by the freight rate statutes of 1905 and 1907, if the rates thus fixed had been charged, as there would have been but for the temporary injunctions herein issued.

(9) The evidence shows that each of complainants has regularly paid for many years' interest on its bonds. There is no evidence to show that any of the railroad property within the state of Missouri has an undue amount of bonds or is unfairly bonded, and the evidence does not show that any of the bonds provide for interest in any sum greater than such bonds should carry. It does show that most of the bonds are at the lowest rates of interest, and much less than the legal rate allowable in Missouri. In thus referring to interest, the St. Louis & Hannibal and Kansas City, Clinton & Springfield companies are excepted.

(10) After the adoption of the two-cent fare statute, there was no substantial increase in travel. For a few weeks there was a small increase largely brought about by interstate passengers buying tickets to state lines, and in part by the novelty. What, if any, increase of travel occurred by reason of said two-cent fare, would be a mere approximation. It has not been substantial, and there is no reason to believe that any such increase will be brought about in the future by a two-cent fare.

(11) The values of the railroad properties in the state of Missouri are found, in the cases tried, to be as follows:

| | Miles. | Value. | Value Per Mile. |
|---|---|---|---|
| St. Louis & San Francisco | 1638.89 | $61,238,414 70 | $36,259 00 |
| Atchison, Topeka & Santa Fé | 348.31 | 15,091,212 00 | 43,326 00 |
| Chicago, Rock Island & Pacific | 515.48 | 19,102,507 59 | 37,058 00 |
| Kansas City Southern | 174.48 | 8,039,084 40 | 46,075 00 |
| St. Louis & Hannibal | 120.61 | 1,143,077 02 | 9,477 00 |
| Missouri, Kansas & Texas | 506.21 | 20,894,229 93 | 41,276 00 |
| Chicago, Burlington & Quincy | 1136.34 | 53,172,907 83 | 46,793 00 |
| Kan. City, Clinton & Springf'd | 151.01 | 2,380,222 48 | 15,762 00 |
| Chicago Great Western | 84.43 | 3,605,236 38 | 42,701 00 |

With the exceptions hereinafter stated, the above valuations of the properties of said nine companies as fixed are in fact practically the same as those fixed by the state assessing board for the purpose of taxation. But aside and apart from the valuations thus fixed by the state board, these findings are that upon the whole evidence said properties are at least of the values above fixed. The evidence shows that included in such sums the state board, after making certain valuations under the heading of "All Other Property" fixed certain valuations, which when added give the totals as above. In argument

it was contended that "All Other Property" included franchise values. This is not deemed important, because it is difficult to see wherein steam railroad properties, like those involved, can have a franchise value. But waiving that, any franchise value that the state board could have considered was necessarily so small a per cent. of the total valuations fixed by the state board as to make no appreciable difference in the result of these cases, because, if altogether admitted, the remaining value is such that no road could obtain a return to which it is herein found to be entitled. But if the property has a franchise value for taxation, it also has such valuation as an earning power, or, rather, upon which returns should be made. In fixing the valuations above set forth, there have been considered the immense terminal values of most of the roads, the amount of stock and bonds outstanding, what it would cost to duplicate the properties both with and without terminals in the large cities, and all the evidence bearing on present values, and in fixing said valuations the sums found are the minimum valuations, the properties being worth at least the sums thus fixed.

The foregoing valuations are the same as fixed by the state assessing boards except as to the property of the St. Louis & Hannibal and of the Kansas City, Clinton & Springfield in the state, which are found to be worth 66⅔ per cent. of the valuations of the state boards.

(12) The interest obligations, except as already stated, are just and reasonable, and should be paid in full, with some dividends to the stockholders in addition. However, and entirely aside from the question of interest, the rates and earnings should in any event be such as to produce a fair return upon the valuations hereinbefore fixed. And such earnings should be on the property within the state as would be equivalent to 6 per cent. per annum, that per cent. being a fair return upon such valuations.

(13) About the same time the two-cent fare statute became operative, passes and other forms of reduced and free transportation were abolished. Since that time they have not been given nor used except in cases of employés actually employed. The passenger earnings were thereby increased, but such increase was not more than approximately 1 per cent.

(14) After the arguments were concluded, at the request of the court, and with the consent of the parties, two experts upon each side, two selected by the railways and two by the defendants, worked with the court for something more than one week. These experts were the same gentlemen representing their respective sides who had done much of the work in preparing the cases for the respective sides for hearing. The court requested these experts to take the numerous tables and tabulate them already in evidence, and to confine themselves wholly to that which had been introduced in evidence in the cases, and to make therefrom a new table for each of the nine cases, showing the earnings and the expenses chargeable to each class of earnings according to the respective theories covered by counsel in the arguments. The court further requested said four experts, after preparing said new tables, that if they agreed, to affix their signatures thereto. This they did below a certificate reciting that the statement of earnings, operating expenses, etc., as to each particular road for the time therein given, correctly shows the results on the various assumptions set forth therein. Said nine statements were by order of this court, February 20, 1909, ordered filed and made of record in the cases. The said nine statements are now and here referred to, and are made part hereof. Each of said nine statements is found by the court to be correct upon the respective theories presented. But the theory entitled as the "state's basis" is rejected for the reason that said statement improperly divides miscellaneous earnings, placing an undue proportion to the benefit of the state. And said basis improperly makes a division of expense upon the ton mile and passenger mile basis, and does not allow a sufficient amount as extra cost of doing state business, and the same does not allow enough for the value of the property, in that it deducts all sums included "All Other Property" multiplied by three.

If the companies had been permitted to charge the amounts per passenger per mile which they did charge and receive prior to the two-cent passenger fare statute, they would have received, in addition to that which they did receive by reason of the statute, and by reason of the temporary injunction being denied, for earnings within the state for a period of 12 months last

preceding the submission of the cases, the following sums (interstate, however, not controlled by statute, but by changed conditions):

| Name of Road. | State Passengers | Interstate Passengers. |
|---|---|---|
| St. L. & S. F. R. R. | $666,008 72 | $509,730 63 |
| A., T. & S. F. R. R. | 30,885 52 | 66,271 62 |
| C., R. I. & P. Ry. and St. L., K. C. & C. Ry. | 124,469 14 | 111,178 60 |
| K. C. So. Ry. | 7,044 49 | 27,260 75 |
| St. L. & H. Ry. | 37,275 38 | 145 23 |
| M., K. & T. Ry. | 140,593 46 | 63,815 12 |
| K. C., C. & S. Ry. | 14,654 57 | 10,846 91 |
| C., B. & Q. R. R. | 394,878 77 | 261,556 41 |
| C. G. W. Ry. | 49,459 47 | 34,621 62 |

In the case of the St. Louis & San Francisco, there were included in expenses sums paid as rentals under a lease given by the Kansas City, Fort Scott & Memphis Railway Company, whose common stock is owned by it, which operates the company under a lease requiring it to pay to the holders of preferred stock of the Fort Scott & Memphis Company, as a rental, a sum equal to 4 per cent. annual dividends. This lease has been in force several years and is a fair one, and such rental has been treated as an operating expense, and is not included in fixed charges. And the court finds that it is an operating expense. But even if it were a fixed charge, it is not material, as the result would not be changed even though the rentals were carried into the fixed charge account. This is so because the amounts carried into state freight expense is only $8,428.56, and interstate passenger expense, $7,443.68.

(15) In the statements hereinbefore referred to made and signed by the four experts, while they correctly set forth the figures on both the revenue theory and the ton and passenger mile theory, the placing of the miscellaneous earnings of the passenger business is arbitrarily fixed, and does not at all proceed upon the passenger mile basis, but for that the revenue basis is taken and fixed. Such earnings are arbitrarily divided without reference to the facts, the result being the state earnings, and especially passenger, are fixed much higher than the actual earnings. Said division, instead of following defendants' theory of the ton mile and passenger mile basis, is upon the revenue basis, from which it is seen that this would be a splitting of theories. But from this and from all the evidence it is plain that even the ton and passenger mile basis theory cannot be worked out without showing a loss, to prevent which an arbitrary change of account must be made as to the miscellaneous business. Even in making this arbitrary change the revenue basis is used, and yet the revenue division of expenses insisted upon by complainants is said not to be recognized. This is utterly illogical and unfair, and does not represent the true facts as to whether such earnings are made at a loss, and there is no reliance whatever to be placed in such method of accounting. In so finding, no reflection whatever is made upon the experts for the state, because, as before found, they are men of the highest character and learning and highly skilled in accounting, and with a proper basis for such accounting their work is perfect. And from their own statements upon the basis adopted herein for making such accounting by the court, the freight business for the period mentioned would have been done at a loss if the statutory rates had been observed, and the passenger business was done at a loss under the two-cent fare statute.

(16) As to each of the nine companies whose cases have been submitted, the earnings and expenses and all other items are different in amount. So with the returns upon value to which the company is entitled. But in no event in any of the cases tried would the freight earnings, after making the deductions herein found, result in a return to any company of more than 3 per cent. With nearly every company an actual deficit is shown, if the 1907 statute had been in force. So under the two-cent fare statute—a deficit as to nearly all of the companies, and not more than 2 per cent. in case of any company. If the freight and passenger business should be combined with the miscellaneous of each class, there would be a deficit as to some, and not

to exceed 3 per cent. as to any of the others. In arriving at these conclusions, and in adopting the tabulations herein set forth, an account has been taken of all earnings, state and interstate, freight and passenger, and miscellaneous; the proportion which state and interstate freight and passenger, exclusive of miscellaneous, bear to all state and interstate, miscellaneous included, and that which they bear to all the earnings of the state; of miscellaneous freight and miscellaneous passenger earnings, undivided as between state and interstate, with the proportion they are of all earnings, freight and passenger; of all expenses divided as between all kinds of freight and passenger business, including miscellaneous, but not divided as between state and interstate; of the deductions to be made from all state freights, not including miscellaneous, of such proportion of expenses of all freight and passenger respectively as the freight and passenger earnings, exclusive of miscellaneous, bear to all earnings; of the deduction of the extra cost; of the diminution of freight earnings if the freight rate statute had been observed; of the value of that portion of the property assignable to the particular traffic. This value is found by taking, for each class of business of the entire value of the property in the state, such proportion as the earnings on that portion of the business bear to all the earnings in the state. A statement so made as to each of the companies whose cases have been submitted is as follows:

(17) The periods taken are representative taken by the experts upon both sides, and were for the months set forth in the column headed "Time." These tables do not follow the form taken by the experts in preparing exhibits to be introduced in evidence, nor do they follow the prepared form adopted by the four experts in making the nine statements hereinbefore referred to. An attempt has been made to abbreviate, but with the results the same as adopted by the experts. These are found to be correct as now to be set forth, and are adopted by the court. If any error has crept into them, the court will make proper correction upon his attention being called thereto after these findings have been filed, which can be readily done upon motion or suggestion. The tables adopted by the court now follow:

### Interstate Freight.

| Company | Time Mo. | Amount. | % of all Freight. | % of all Earnings. |
|---|---|---|---|---|
| St. L. & S. F. R. R. | 3 | $2,214,002 82 | 76 94 | 54 68 |
| A. T. & S. F. R. R. | 6 | 1,872,915 00 | 90 05 | 67 72 |
| C. R. I. & P. Ry. | 3 | 665,228 16 | 79 38 | 59 86 |
| K. C. So. Ry. | 6 | 702,249 91 | 79 35 | 67 11 |
| St. L. & H. Ry. | 12 | 51,735 05 | 36 25 | 24 61 |
| M. K. & T. Ry. | 6 | 1,333,455 26 | 81 73 | 57 89 |
| C. B. & Q. R. R. | 12 | 6,454,699 87 | 78 75 | 52 40 |
| K. C. C. & S. Ry. | 12 | 116,893 60 | 68 27 | 41 04 |
| C. G. W. Ry. | 6 | 224,169 58 | 86 02 | 57 39 |

### State Freight.

| Company | Amount. | % of all Freight. | % of all Earnings. |
|---|---|---|---|
| St. L. & S. F. R. R. | $ 577,192 84 | 20 04 | 14 26 |
| A. T. & S. F. R. R. | 141,133 00 | 6 79 | 5 10 |
| C. R. I. & P. Ry. | 150,953 68 | 18 02 | 13 58 |
| K. C. So. Ry. | 38,748 76 | 4 38 | 3 70 |
| St. L. & H. Ry. | 87,941 99 | 61 62 | 41 84 |
| M. K. & T. R. R. | 277,416 52 | 17 01 | 12 04 |
| C. B. & Q. R. R. | 1,580,529 64 | 19 28 | 12 83 |
| K. C. C. & S. Ry. | 45,003 15 | 26 29 | 15 80 |
| C. G. W. Ry. | 29,129 36 | 11 18 | 7 45 |

### Miscellaneous Freight.

| Company | Amount. | % of all Freight. | % of all Earnings. |
|---|---|---|---|
| St. L. & S. F. R. R............................................ | $   86,814 57 | 3 02 | 2 14 |
| A. T. & S. F. R. R............................................ | 65,833 56 | 3 16 | 2 38 |
| C. R. I. & P. Ry............................................ | 21,815 70 | 2 60 | 1 96 |
| K. C. So. Ry............................................ | 144,046 62 | 16 27 | 13 77 |
| St. L. & H. Ry............................................ | 3,044 11 | 2 13 | 1 45 |
| M. K. & T. Ry............................................ | 20,603 37 | 1 26 | 0 89 |
| C. B. & Q. Ry............................................ | 161,579 41 | 1 97 | 1 31 |
| K. C. C. & S. Ry............................................ | 9,319 58 | 5 44 | 3 27 |
| C. G. W. Ry............................................ | 7,280 24 | 2 80 | 1 86 |

### Interstate Passenger.

| Company | Amount. | % of all Passenger | % of all Earnings. |
|---|---|---|---|
| St. L. & S. F. R. R............................................ | $  368,687 43 | 31 49 | 9 11 |
| A. T. & S. F. R. R............................................ | 355,318 12 | 51 81 | 12 85 |
| C. R. I. & P. Ry............................................ | 113,524 21 | 41 53 | 10 22 |
| K. C. So. Ry............................................ | 89,504 58 | 55 47 | 8 55 |
| St. L. & H. Ry............................................ | 198 19 | 0 29 | 0 09 |
| M. K. & T. R. R............................................ | 303,214 54 | 45 12 | 13 16 |
| C. B. & Q. Ry............................................ | 1,777,788 27 | 43 15 | 14 43 |
| K. C. C. & S. Ry............................................ | 41,145 00 | 36 22 | 14 45 |
| C. G. W. Ry............................................ | 72,360 87 | 55 62 | 18 53 |

### State Passenger.

| Company | Amount. | % of all Passenger | % of all Earnings. |
|---|---|---|---|
| St. L. & S. F. R. R............................................ | $  599,051 59 | 51 17 | 14 79 |
| A. T. & S. F. R. R............................................ | 104,370 19 | 15 22 | 3 77 |
| C. R. I. & P. Ry............................................ | 114,853 04 | 42 02 | 10 33 |
| K. C. So. Ry............................................ | 31,865 28 | 19 75 | 3 05 |
| St. L. & H. Ry............................................ | 52,667 38 | 78 04 | 25 05 |
| M. K. & T. R. R............................................ | 246,368 53 | 36 66 | 10 70 |
| C. B. & Q. R. R............................................ | 1,611,702 92 | 39 11 | 13 09 |
| K. C. C. & S. Ry............................................ | 47,646 80 | 41 95 | 16 73 |
| C. G. W. Ry............................................ | 38,105 03 | 29 28 | 9 75 |

Miscellaneous Passenger.

| Company | Amount. | % of all Passenger | % of all Earnings. |
|---|---|---|---|
| St. L. & S. F. R. R......................................... | $ 203,077 28 | 17 34 | 5 02 |
| A. T. & S. F. R. R......................................... | 226,080 00 | 32 97 | 8 18 |
| C. R. I. & P. Ry......................................... | 44,980 08 | 16 45 | 4 05 |
| K. C. So. Ry......................................... | 39,973 54 | 24 78 | 3 82 |
| St. L. & H. Ry......................................... | 14,619 99 | 21 67 | 6 96 |
| M. K. & T. Ry......................................... | 122,458 22 | 18 22 | 5 32 |
| C. B. & Q. R. R......................................... | 731,021 89 | 17 74 | 5 94 |
| K. C. C. & S. Ry......................................... | 24,797 39 | 21 83 | 8 71 |
| C. G. W. Ry......................................... | 19,643 99 | 15 10 | 5 02 |

(18) All Freight and Passenger Expenses, Including Miscellaneous, Less Taxes and Rentals, and Percentages to Earnings, Undivided as Between State and Interstate.

| Company | Freight | Passenger | Taxes and Rentals, Freight | Taxes and Rentals, Passengers |
|---|---|---|---|---|
| St. L. & S. F. R....... | 1,802,813.26 | 974,816.61 | 112,452.04 | 38,979.63 |
| A. T. & S. F............. | 1,382,738.65 | 572,167.20 | 32,361.50 | 10,854.04 |
| C. R. I. & P............. | 619,199.73 | 317,633.62 | 74,227.43 | 21,015.44 |
| K. C. So................... | 571,297.54 | 141,432.56 | 22,331.70 | 3,737.37 |
| St. L. & H............... | 117,908.81 | 68,343.04 | 5,994.07 | 2,273.61 |
| M. K. & T................ | 1,010,643.65 | 516,589.98 | 119,017.87 | 58,465.49 |
| C. B. & Q................ | 6,793,610.60 | 3,527,311.81 | 12,235.30 Cr. | 6,152.58 Cr. |
| K. C. C. & S............. | 98,988.29 | 138,384.77 | 9,182.36 | 5,749.38 |
| C. G. W................... | 198,887.69 | 126,355.88 | 12,294.18 | 11,312.16 |

| Company | % of said expenses to earnings exclusive of taxes and rentals | | Same, taxes and rentals. | |
|---|---|---|---|---|
| | Freight | Passenger | Freight | Passenger |
| St. L. & S. F. R. R............. | 62.64 | 83.26 | 3.91 | 3.33 |
| A. T. & S. F. R. R............. | 66.48 | 83.43 | 1.55 | 1.58 |
| C. R. I. & P. Ry............. | 73.89 | 116.20 | 8.86 | 7.68 |
| K. C. So. Ry............. | 64.55 | 87.66 | 2.52 | 2.31 |
| St. L. & H. Ry............. | 82.61 | 101.27 | 4.19 | 3.37 |
| M. K. & T. Ry............. | 61.95 | 76.87 | 7.29 | 8.69 |
| C. B. & Q. Ry............. | 82.88 | 85.60 | 0.00 | 0.00 |
| K. C. C. & S. Ry............. | 57.81 | 121.83 | 5.36 | 5.06 |
| C. G. W. Ry............. | 76.33 | 97.11 | 4.71 | 8.68 |

The time of the foregoing tables is the same as in first table above.

(19) The following nine tables show the state earnings and expenses, valuation, return on value, and interest charge of the said nine roads respectively whose cases have been submitted. The other cases are to be covered by decrees by agreement the same as certain decrees of the nine cases, all of which is of record.

St. Louis & San Francisco Railroad Company.

Period, Three Months.

| State Earnings and Expenses | Freight | Passenger |
|---|---|---|
| State earnings.................................. | 577,192.84 | 599,051.59 |
| State expenses................................. | 361,644.33 | 498,716.20 |
| Leaving ..................................... | 215,548.51 | 100,335.39 |
| Less taxes and rentals......................... | 22,760.29 | 20,097.90 |
| Leaving ..................................... | 192,788.22 | 80,237.49 |
| Extra cost of doing state business, freight 50%, passenger 25%.......................... | 131,425.08 | 53,907.36 |
| Leaving ..................................... | 61,363.14 | 26,330.13 |
| Diminution in earnings if the state rates in question had been charged................. | 11,389.27 | |
| Leaving ..................................... | 49,973.87 | 26,330.13 |
| Valuation | 14.26% | 14.79% |
| Assignable proportion of value for representative period, and 6% interest thereon is.......................................... | 130,988.97 | 135,857.42 |
| Return on Value | | |
| (a) Actual return upon the assignable value found in subdivision above, the amount shown in first subdivision above is........ | 2.29% | 1.16% |
| (b) Same without allowance for extra cost.. | 3.2% | 3.5% |
| Interest Charge | | |
| Actual interest charge paid on assignable properties ................................... | 116,792.45 | 121,133.27 |

### Atchison, Topeka & Santa Fé Railway Company.

#### Period, Six Months.

| State Earnings and Expenses | Freight | | Passenger | |
|---|---|---|---|---|
| State earnings................................... | 141,133.00 | | 104.370.19 | |
| State expenses.................,.................. | 92,581.89 | | 87,834.09 | |
|     Leaving ................................. | 48,551.11 | | 16,536.10 | |
| Less taxes and rentals........................ | 3,503.41 | | 901.74 | |
|     Leaving ................................. | 45,047.70 | | 15,634.36 | |
| Extra cost of doing state business, freight 50%, passenger 25%.......................... | 41,859.55 | | 17,947.71 | |
|     Leaving ................................. | 3,188.15 | | 2,313.35 | (Red Ink) (Deficit) |
| Diminution in earnings if the state rates in question had been charged................... | 13,885.87 | | | |
|     Leaving ................................. | 10,697.72 | (Red Ink) (Deficit) | 2,313.35 | (Red Ink) (Deficit) |
| Valuation | 5.10% | | 3.77% | |
| Assignable proportion of value for representative period, and 6% interest thereon.. | 23,089.35 | | 17,068.16 | |
| Return on Value | | | | |
| (a) Actual return upon the assignable value found in subdivision above, the amount shown in first subdivision above is........ (b) Same without allowance for extra cost... | Nothing 8.% | | Nothing 5.49% | |
| Interest Charge | | | | |
| Actual interest charge paid on assignable properties ..................................... | 17,934.56 | | 13,257.51 | |

The Chicago, Rock Island & Pacific Railway Company.

Period, Three Months.

| State Earnings and Expenses | Freight | | Passenger | |
|---|---|---|---|---|
| State earnings .................................. | 150,953.68 | | 114,853.04 | |
| State expenses.................................. | 111,579.80 | | 133,469.65 | |
| Leaving .................................. | 39,373.88 | | 18,616.61 | (Red Ink) (Deficit) |
| Less taxes and rentals......................... | 13,375.78 | | 8,830.68 | |
| Leaving .................................. | 25,998.10 | | 27,447.29 | (Red Ink) (Deficit) |
| Extra cost of doing state business, freight 50%, passenger 25%.......................... | 41,919.82 | | 17,501.61 | |
| Leaving .................................. | 15,921.72 | (Red Ink) (Deficit) | 44,948.90 | (Red Ink) (Deficit) |
| Diminution in earnings if the state rates in question had been charged................... | 9,989.43 | | | |
| Leaving .................................. | 25,911.15 | (Red Ink) (Deficit) | 44,948.90 | (Red Ink) (Deficit) |
| Valuation | | 13.58% | | 10.33% |
| Assignable proportion of value for representative period and 6% interest thereon.. | 38,911.81 | | 29,599.34 | |
| Return on Value | | | | |
| (a) Actual return upon the assignable value found in subdivision above, the amount shown in first subdivision above is........ (b) Same without allowance for extra cost.. | | Nothing 2.47% | | Nothing Nothing |
| Interest Charge | | | | |
| Actual interest charge paid on assignable properties ................................... | 24,907.02 | | 18,946.21 | |

## The Kansas City Southern Railway Company.

### Period, Six Months.

| State Earnings and Expenses | Freight | | Passenger | |
|---|---|---|---|---|
| State earnings................................... | 38,748.76 | | 31,865.28 | |
| State expenses................................. | 25,022.83 | | 27,932.93 | |
| Leaving ................................... | 13,725.93 | | 3,932.35 | |
| Less taxes and rentals........................ | 978.13 | | 733.13 | |
| Leaving ................................... | 12,747.80 | | 3,194.22 | |
| Extra cost of doing state business, freight 50%, passenger 25%........................ | 11,711.60 | | 5,346.15 | |
| Leaving ................................... | 1,036.20 | | 2,151.95 | (Red Ink) (Deficit) |
| Diminution in earnings if the state rates in question had been charged................ | 2,957.58 | | | |
| Leaving ................................... | 1,921.38 | (Red Ink) (Deficit) | 2,151.93 | (Red Ink) (Deficit) |
| **Valuation** | 8.70% | | 8.05% | |
| Assignable proportion of value for representative period, and 6% interest thereon.... | 8,923.38 | | 7,355.76 | |
| **Return on Value** | | | | |
| (a) Actual return upon the assignable value found in subdivision above, the amount shown in the first subdivision above is.... (b) Same without allowance for extra cost.. | Nothing 6.58% | | Nothing 2.6% | |
| **Interest Charge** | | | | |
| Actual interest charge paid on assignable properties ................................... | 5,295.38 | | 4,365.11 | |

### The St. Louis & Hannibal Railway Company.

Period, Twelve Months.

| State Earnings and Expenses | Freight | | Passenger | |
| --- | --- | --- | --- | --- |
| State earnings.................................. | 87,941.99 | | 52,667.38 | |
| State expenses.................................. | 72,655.40 | | 53,331.91 | |
| Leaving ................................... | 15,286.59 | | 667.53 | (Red Ink) (Deficit) |
| Less taxes and rentals......................... | 3,693.55 | | 1,774.32 | |
| Leaving ................................... | 11,593.04 | | 2,441.85 | (Red Ink) (Deficit) |
| Extra cost of doing state business, freight 50%, passenger 25%......................... | 12,026.69 | | 2,444.68 | |
| Leaving ................................... | 433.65 | (Red Ink) (Deficit) | 4,886.53 | (Red Ink) (Deficit) |
| Diminution in earnings if the state rates in question had been charged.................. | 15,126.02 | | | |
| Leaving................................... | 15,559.67 | (Red Ink) (Deficit) | 4,886.53 | (Red Ink) (Deficit) |
| Valuation | 41.84% | | 25.05% | |
| Assignable proportion of value for representative period, and 6% interest thereon.... | 28,694.05 | | 17,179.40 | |
| Return on Value | | | | |
| (a) Actual return upon the assignable value found in subdivision above, the amount shown in the first subdivision above is.... (b) Same without allowance for extra cost.. | Nothing Nothing | | Nothing Nothing | |
| Interest Charge | | | | |
| Actual interest charge paid on assignable property ..................................... | 16,359.44 | | 9,794.55 | |

Missouri, Kansas & Texas Railway Company.

Period, Six Months.

| State Earnings and Expenses | Freight | Passenger |
|---|---|---|
| State earnings................................... | 277,416.52 | 246,368.53 |
| State expenses.................................. | 171,910.48 | 189,381.89 |
| Leaving ..................................... | 105,506.04 | 56,986.64 |
| Less taxes and rentals........................... | 20,244.94 | 21,433.45 |
| Leaving.................................... | 85,261.10 | 35,553.19 |
| Extra cost of doing state business, freight 50%, passenger 25%.......................... | 66,696.09 | 27,482.59 |
| Leaving.................................... | 19,165.01 | 8,070.60 |
| Diminution in earnings if the state rates in question had been charged................. | 20,222.85 | |
| Leaving.................................... | 1,059.84    (Red Ink) (Deficit) | 8,070.60 |
| Valuation | 13.04% | 10.70% |
| Assignable proportion of value for representative period, and 6% interest thereon.... | 75,469.96 | 67,070.48. |
| Return on Value | ʊ | |
| (a) Actual return upon the assignable value found in subdivision above, the amount shown in the first subdivision above is.... (b) Same without allowance for extra cost.. | Nothing 5.18% | 0.72% 3.18% |
| Interest Charge | | |
| Actual interest charge paid on assignable property ..................................... | 62,439.68 | 55,490.41 |

Chicago, Burlington & Quincy Railroad Company.

Period, Twelve Months.

| State Earnings and Expenses | Freight | Passenger |
|---|---|---|
| State earnings................................... | 1,580,529.64 | 1,611,702.92 |
| State expenses.................................. | 1,324,453.83 | 1,489,746.71 |
| Leaving.................................... | 256,075.81 | 121,956.21 |
| Less taxes and rentals......................... | 2,487.99 Cr. | 2,798.50 Cr. |
| Leaving.................................... | 258,563.80 | 124,754.71 |
| Extra cost of doing state business, freight 50%, passenger 25%......................... | 484,129.29 | 158,205.70 |
| Leaving.................................... | 225,565.49  (Red Ink) (Deficit) | 33,450.99  (Red Ink) (Deficit) |
| Diminution in earnings if the state rates in question had been charged................. | 112,533.71 | |
| Leaving.................................... | 338,099.20  (Red Ink) (Deficit) | 33,450.99  (Red Ink) (Deficit) |
| Valuation | 12.83% | 13.09% |
| Assignable proportion of value for representative period, and 6% interest thereon.... | 409,325.04 | 417,620.02 |
| Return on Value | | |
| (a) Actual return upon the assignable value found in subdivision above, the amount shown in the first subdivision above is.... (b) Same without allowance for extra cost.. | Nothing 2.11% | Nothing 1.79% |
| Interest Charge | | |
| Actual interest charge paid on assignable property ...................................... | 132,735.02 | 135,424.89 |

## Kansas City, Clinton & Springfield Railroad Company.

### Period, Twelve Months.

| State Earnings and Expenses | Freight | Passenger | |
|---|---|---|---|
| State earnings.................................. | 45,003.15 | 47,646.80 | |
| State expenses................................. | 26,024.02 | 58,052.41 | |
|     Leaving................................... | 18,979.13 | 10,405.61 | (Red Ink) (Deficit) |
| Less taxes and rentals......................... | 2,414.04 | 2,411.86 | |
|     Leaving................................... | 16,565.09 | 12,817.47 | (Red Ink) (Deficit) |
| Extra cost of doing state business, freight 50%, passenger 25%......................... | 8,483.30 | 7,625.00 | |
|     Leaving................................... | 8,081.79 | 20,442.47 | (Red Ink) (Deficit) |
| Diminution in earnings if the state rates in question had been charged................. | 2,970.21 | | |
|     Leaving................................... | 5,111.58 | 20,442.47 | (Red Ink) (Deficit) |
| **Valuation** | 15.80% | 16.73% | |
| Assignable proportion of value for representative period, and 6% interest thereon.... | 22,564.51 | 23,892.67 | |
| **Return on Value** | | | |
| (a) Actual return upon the assignable value found in subdivision above, the amount shown in the first subdivision above is.... (b) Same without allowance for extra cost.. | 1.36% 3.61% | Nothing Nothing | |
| **Interest Charge** | | | |
| Actual interest charge paid on assignable property ..................................... | 23,881.78 | 25,288.48 | |

## Chicago Great Western Railway Company.

### Period, Six Months.

| State Earnings and Expenses | Freight | | Passenger | |
|---|---|---|---|---|
| State earnings.................................. | 29,129.36 | | 38,105.03 | |
| State expenses ................................. | 22,235.64 | | 36,996.98 | |
| Leaving...................................... | , 6,893.72 | | 1,108.05 | |
| Less taxes and rentals........................ | 1,374.49 | | 3,312.25 | |
| Leaving...................................... | 5,519.23 | | 2,204.20 | (Red Ink) (Deficit) |
| Extra cost of doing state business, freight 50%, passenger 25%.......................... | 9,347.72 | | 6,090.35 | |
| Leaving...................................... | 3,828.49 | (Red Ink) (Deficit) | 8,294.55 | (Red Ink) (Deficit) |
| Diminution in earnings if the state rates in question had been charged...... .......... | 1,893.41 | | | |
| Leaving...................................... | 5,721.90 | (Red Ink) (Deficit) | 8,294.55 | (Red Ink) (Deficit) |
| **Valuation** | 7.45% | | 9.75% | |
| Assignable proportion of value for representative period, and 6% interest thereon.... | 8,057.70 | | 10,545.32 | |
| **Return on Value** | | | | |
| (a) Actual return upon the assignable value found in subdivision above, the amount shown in the first subdivision above is..... (b) Same without allowance for extra cost.. | Nothing 2.69% | | Nothing Nothing | |
| **Interest Charge** | | | | |
| Actual interest charge paid on assignable property ..................................... | 7,164.08 | | 9,375.81 | |

(20) The court believes that the foregoing findings are all that are material and all that are necessary to make. However, if any party believes that any material finding of fact has been omitted, upon application of such party the same will be considered and made if deemed advisable; and likewise if any of the foregoing computations or figures have been erroneously made. But such application, to be entertained, must be made within 30 days from this date.

And each, all, and every of the foregoing are made as the findings of the court, and are now and here in open court this March 8, 1909, ordered filed and made of record in said cases and all of them.

168 F.—22

Frank Hagerman, for complainants.

W. F. Evans, for·complainant St. Louis & S. F. R. Co.

M. A. Low, for complainants Chicago, R. I. & P. Ry. Co. and St. Louis, K. C. & C. Ry. Co.

O. M. Spencer, for complainant Chicago, B. & Q. R. R. Co.

J. G. Trimble, for complainant Quincy, O. & K. C. R. Co.

Gardiner Lathrop, for complainant Atchison, T. & S. F. R. Co.

S. W. Moore, for complainant Kansas City & S. Ry. Co.

Geo. P. B. Jackson, for complainant Missouri, K. & T. R. Co.

J. L. Minnis, for complainant Wabash R. Co.

R. A. Brown, for complainant St. Joseph & G. I. Ry. Co.

E. L. Scarritt, for complainant Chicago & A. R. Co.

John H. Lucas, for complainant Kansas City, C. & S. Ry. Co.

M. L. Clardy, for complainants Missouri Pac. R. Co. and St. Louis, I. M. & S. R. Co.

J. D. Hostetter, for complainant St. Louis & H. Ry. Co.

S. H. West, for complainant St. Louis Southwestern Ry. Co.

A. G. Briggs, for complainant Chicago G. W. Ry. Co.

Burton Hanson, for complainant Chicago, M. & St. P. Ry. Co.

Herbert S. Hadley, Atty. Gen., John Kennish, Asst. Atty. Gen., S. B. Ladd, and Frederick W. Lehmann, for defendants.

SMITH McPHERSON, District Judge (after stating the facts as above). 1. Each of the 18 railroad companies is doing a general railroad business within the state of Missouri, all but one doing both a state and an interstate business. Under the general railroad statutes of the state, the railroads were classified under three classes, the one class being allowed to charge·for passenger rates three cents per mile, and the other two classes, four cents per mile. Freights likewise were classified with certain maximum rates. The Railroad Commissioners of the state were authorized to fix and establish rates, not in excess, however, of these maximum rates fixed by statute.

In the year 1905 the Legislature of the state, by statute which took effect June 16, 1905, provided for certain maximum charges. On the day the statute took effect each of the railroad companies filed their bills of complaint herein against the Attorney General and Railroad Commissioners, asking that they be enjoined from enforcing the statute upon the ground that the rates thus fixed were not remunerative, resulting, as·is alleged, in the taking of their property without compensation. A restraining order in each case· was issued, and within a few days thereafter, upon notice and full hearing, a temporary writ of injunction as prayed was issued. Several months thereafter the cases were referred to a special master to take the evidence and make his findings of fact and report the same to the court.

In 1907 the Legislature of the state repealed the statute of 1905 and enacted a substitute therefor, which act was to take effect in June, 1907. On or about the day the statute was to take effect, each of the complainants filed its amended and supplemental bill, setting forth the pendency of the actions and the action theretofore taken by the court therein, and asking that the enforcement of the statutes, one of which fixes certain maximum freight rates, and the other passenger rates of two cents a mile, be enjoined on the ground that such rates were not remunerative. but confiscatory, and, if enforced,

would be taking the property of the railroad companies without compensation. At or about the same time the state officers instituted proceedings in certain state courts of Missouri against the railroad companies asking for an order that said two statutes of 1907 be enforced.

The Attorney General and his associates insisted that an entirely new situation was presented, and insisted that the proceedings were instituted in the state courts in advance of filing the supplemental bills herein, and insisted that the state courts had first acquired jurisdiction of the subject-matter, which would be to the exclusion of any action by this court. The railroad companies insisted that the general subject-matter was covered by the original bills of complaint and defendants' answers thereto, and that the statutes of 1907 should be carried forward by supplemental bill. It was likewise most earnestly contended that the actions in this court were in effect against the state of Missouri, in contravention of the eleventh amendment to the Constitution of the United States. But this court, after the fullest argument and consideration, adjudged that this court was not seeking to take jurisdiction against the state of Missouri as a state, and that the very office and nature of the supplemental bill, as recognized from time immemorial by the equity practice, required this court to take cognizance of the supplemental bills and proceed with the litigation. 161 Fed. 419.

In June last, by agreement of parties, the court revoked the previous order of reference to the special master, and directed him to return to this court the evidence he had already taken, and ordered that the case be tried upon oral testimony and such documentary evidence as the respective parties might offer. The evidence has been concluded, and the cases have been fully argued, and are now for final decree.

2. Many believe that the better and safer practice would be to confine all litigation to the state courts wherein is involved the validity of rates to be observed by railroads and other public utilities, when such rates are fixed by ordinances of a city or statutes of a state. It is insisted that this would be more deferential and more in a spirit of comity to first allow the state courts to pass upon such questions. It is urged that the decree of a state court could be carried to the Supreme Court of the United States for final decision.

This is plausible and convincing to men who have not thoroughly considered the question. It is plausible, because such a course can be followed. But every thoughtful and patriotic man well knows and believes in the proposition that the Supreme Court of the United States should ultimately pass upon all questions arising under the Constitution of the United States. And the question whether rates thus fixed by ordinance or statute are confiscatory or remunerative is one arising under the Constitution of the United States, and that question is wholly a question of fact, and is no longer an open question as to the law. This being so, the question cannot be passed upon by the Supreme Court of the United States on these questions of fact when there is a conflict in the testimony. Section 709 of the Revised Statutes of the United States (U. S. Comp. St. 1901, p. 575) is the only authority for taking a case from the highest court of a

state to the Supreme Court of the United States, and the procedure thereby allowed is by writ of error. And the office of a writ of error is to authorize an appellate court to review questions of law, and not to review questions of fact. So that, when a case goes from the Supreme Court of a state to the Supreme Court of the United States, it can only go by writ of error, and the Supreme Court of the United States necessarily must take all questions of fact as being foreclosed by the state courts. Therefore, when the case is wholly dependent on controverted questions of fact, it is utterly useless to carry the case to the United States Supreme Court from the decision of the state courts, as an affirmance necessarily will be ordered, and the question as to whether the United States Constitution is being trampled down cannot be considered. There is no other method of reviewing the decision of the state court by the Supreme Court of the United States than by writ of error, and this is so in chancery cases as well as in actions at law. State Corporation Com. of Va. v. Atlantic Coast Line Co. (recently decided by the Supreme Court of the United States) 29 Sup. Ct. 67, 53 L. Ed. ——; Bement v. National Harrow Co., 186 U. S. 70, 83, 22 Sup. Ct. 747, 46 L. Ed. 1058; Dower v. Richards, 151 U. S. 658, 666, 14 Sup. Ct. 452, 38 L. Ed. 305; Egan v. Hart, 165 U. S. 188, 17 Sup. Ct. 300, 41 L. Ed. 680; Adams v. Church, 193 U. S. 510, 24 Sup. Ct. 512, 48 L. Ed. 769; Chrisman v. Miller, 197 U. S. 313, 319, 25 Sup. Ct. 468, 49 L. Ed. 770.

It follows that all efforts to enforce the trial of such questions in state courts would result, if successful, in having the state court finally determine when the national Constitution, as the supreme law of the land, shall be applied. The Supreme Court of the United States is the tribunal to finally determine all questions, including those of fact, wherein the national Constitution is involved.

3. Upon their face, the statutes in question are with reference only to state commerce. But it is urged that they are void because in effect they directly have to do with interstate commerce. The facts are as follows:

Between Kansas City and the Joplin mining district there are three lines of railway. The Missouri Pacific between these points is wholly within the state, and the other two partly within and partly without the state, and therefore, between the two Missouri cities of Kansas City and Joplin, are doing an interstate business under the decision of Hanley v. R. R., 187 U. S. 617, 23 Sup. Ct. 214, 47 L. Ed. 333. The same situation exists between the cities of St. Joseph and Kansas City, two of the roads being wholly within the state between the two points, and two partly within and partly without. And between the cities of St. Joseph and St. Louis such situation is emphasized, the Burlington Road being wholly within the state between the two cities, and the Missouri Pacific a part of the distance being within the state of Kansas. The facts are that, when the Missouri statutes lowered the passenger rates on the roads wholly within the state between said points, the interstate roads between said points were compelled by competition to lower their rates to correspond with the state rates thus fixed by statute. By reason thereof the argument is that the Missouri statutory rates control the interstate rates

between the cities named, and therefore are void as being in conflict with the commerce clause of the national Constitution. During the period of railroad building, for a time the Western termini were at the Mississippi river. By reason thereof, and by reason of competition on account of river transportation, the railways fixed rates from the East to that river. After a time roads were completed to the Missouri river. Rates to points on that river were fixed on rates to the Mississippi river, plus rates between the two rivers. And for 30 years or more rates have been thus fixed. And, as the Missouri statutes lower the rates between the two rivers, the argument is that the statutes lower the interstate rates from the East to Missouri river points, and to points to the West.

This presents a great question, and one which is far-reaching, and in importance cannot be overstated. In the great case of Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, decided but last year, the Supreme Court in its majority opinion, in speaking of this, said: "The question is not, at any rate, frivolous." But the point was not decided. But here the question is fairly and sharply presented for decision, with no precedents directly in point.

From the days of the Confederacy to the present time, there have been clashings between the national government and the states, owing, in part to the ever-changing trade and commerce, and in part to the different schools of belief as to our system of government. And the pendulum will ever move back and forth. Even those who most strongly denounce the Kentucky Resolutions and the doctrine of nullification are often the first to forget that they believe in not only the express but the implied powers of our government as taught by Marshall in McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, and that this government is one of the whole people. Such as thus believe are often the first to advocate and rush through, in the form of state regulation, measures for their own state, regardless of the rights of the people of other states. Neither the Ohio river nor any other boundary has been the dividing line. Many of the cases in which state statutes have been declared void by the Supreme Court are statutes requiring a license to sell imported goods, imposing a tax on bills of lading for gold carried out of the state, imposing taxes on alien passengers, imposing taxes on passengers and merchandise carried into or out of the state, taxing drummers, regulating telegrams sent to other states, taxing those who use wharves, requiring inspection of animals for slaughter, and other like statutes in principle. All such statutes have gone down by reason of the commerce clause and the uniform holdings of the Supreme Court.

The commerce clause gives Congress the power to regulate commerce: (1) With foreign nations; (2) among the several states; (3) with the Indian tribes.

As to the first and last, no doubt Congress cannot only regulate, but can prohibit. It is another proposition whether commerce can be prohibited among the states.

One of the methods resorted to for the construction of constitutional provisions, as well as of statutes, is to ascertain the then exist-

ing evils. We find that New York and other seacoast states placed burdens on commerce from inland points to seacoast points and across such states for shipment by water. It was burdens on commerce that the inland localities complained of, and that such burdens should not be imposed, was the reason for adopting the commerce clause. If there had been no such burdens, it is likely that there would have been no commerce clause, and possibly no Constitution. I have searched diligently, but find no case decided by the Supreme Court declaring a state statute void that did not in some form and in some manner place a burden on, or in some way hamper or obstruct, commerce from or to another state.

The case of Louisville & Nashville R. R. v. Eubank, 184 U. S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416, comes more nearly sustaining the proposition that the statutes of Missouri impinge upon the commerce clause than any other case that I recall. There the state of Kentucky by its Constitution provided that more should not be charged for a short than a long haul. The company had rates in force from Nashville, Tenn., to Louisville, Ky., which were less than was being charged from points in Southern Kentucky to Louisville. This was held by the Court of Appeals of Kentucky to be in violation of the state Constitution. So that we have a case of a state law, with the decision of the state courts read into it, providing that more shall not be charged for a short haul wholly within the state than for a long haul partly without the state. This must be so, because the same provision of the Kentucky Constitution when applied to places all within the state was upheld by the Supreme Court, as will appear from the case of Louisville & Nashville R. R. v. Kentucky, 183 U. S. 503, 22 Sup. Ct. 95, 46 L. Ed. 298.

And the case of Wabash, etc., R. R. v. Illinois, 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244, was decided in like manner, because and for the only reason that the Supreme Court of Illinois had so ruled as to read into the statute the objectionable feature.

But the Missouri courts have not so construed these statutes of the state. When they do so decide, then the Eubank and Illinois cases will be the precedents to thwart such legislation as thus construed. In the meantime there is no belief that the Missouri courts will so decide.

The case of Hall v. De Cuir, 95 U. S. 485, 24 L. Ed. 547, is cited by counsel for the railways. Louisiana had a statute requiring carriers to receive and carry passengers without distinction on account of race or color. The steamboat in question plied between New Orleans and Vicksburg, doing both a state and an interstate business. The vessel was duly enrolled and licensed for the coasting trade. The boat had an upper and a lower cabin, the upper for white people, and the lower for colored persons. The plaintiff, De Cuir, was a colored woman, and took passage at a landing in Louisiana for another landing in that state. Being refused admission to the upper cabin solely because she was colored, she was awarded damages in a state trial court, which judgment was affirmed by the state Supreme Court. The Supreme Court of the United States reversed the judgment. Two

reasons were given for the reversal, the one by Justice Clifford on the ground that navigation of the Mississippi river is wholly within the control of Congress. The other opinion was by the Chief Justice, who grounded his opinion upon the proposition that, with the objections of most people to associating and rooming with colored persons, to allow a colored woman to be carried in the first cabin, even though but for a ride within the state, would drive white passengers seeking an interstate ride from the boat. Or, as I have hereinbefore stated, the statute in effect placed a burden on the interstate business. After discussing the question and the many and great difficulties in applying the commerce clause, the Chief Justice said:

"But we think it may safely be said that state legislation which seeks to impose a direct burden upon interstate commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress."

The state statute, in order to be declared void, must by its terms and recitals interfere directly with commerce to or from another state, or the statute by construction given it by the highest court of the state must so operate in its results. But here we have no such recitals in the statute, and it has not been so declared to mean by the Missouri courts. And, while counsel for the railways do not in terms so insist, they in effect urge that the laws of political economy, custom, and convenience shall act as a substitute for Missouri statutes and the decrees of the Missouri Supreme Court. In other words, they in effect, and I believe in language, insist that the rules formulated a third of a century ago for making rates first to the one river, and then between the two rivers, and the laws of competition, shall be regarded as the equivalent of statutory law. I am mindful that it is believed by many that to not recognize these laws of trade will impair, if not destroy, the great cities like St. Joseph, Kansas City, and St. Louis. I am mindful of the fact that between the two rivers the distance by the Burlington is but 198 miles, with other roads 300 miles or more, and that the shorter road necessarily fixes the rates between all points on the rivers. But competition does that, and the statutes are silent. The statute may or may not be unfair. I am considering the commerce clause as to its bearing on statutory enactments, and am not forgetting that many valid statutes are unfair, and some even unrighteous.

I have believed heretofore that the rights and duties, powers and prerogatives of any one state are the same, neither more nor less, than those of any other state, and this is so whether we compare two or more of the original thirteen, or one of the older with one of the newer states. But in effect the argument of counsel for the railways is that this is not so. Missouri and Maine were admitted into the Union the same day by the same enactment. Maine has but its percentage of commerce into and out of the state, with no trans-state business by reason of its geographical position, and has no large city. Missouri is a central state, with large cities, one of which is third in importance as a wholesale center, and second to but few as a manufacturing place. St. Louis and Kansas City are the gateways for both commerce and passengers, surpassed only by one or

possibly two other places. These facts are of tremendous importance
to those who legislate either for the state or the nation. That legis-
lation can be harmful to these great interests, any thoughtful person
can readily see. But that these facts, important as they are, can be
used to give a construction to or coloring of the commerce clause, I
do not believe. In my opinion it is much the wiser to contend for
the strength and power of the nation, by insisting also upon the rights
and powers of the states, as was intended they should have. For a
third of a century it has been the recognized constitutional construc-
tion that the states have the power within defined limits to regulate
charges by railways wholly within the state. And to now say that
one state like Maine can regulate charges by a railway for transporta-
tion wholly within the state, and that Missouri cannot because flanked
by two great rivers, and by a long-time custom in fixing rates, is to
announce a rule not heretofore recognized, and in my opinion one
entirely illogical.

It may or may not be true that it would be for the better to have
all the interstate railways of the country, doing both a state and an
interstate business, under one supervising authority, such as a com-
mission, regulating both classes of business. But under the commerce
clause can this be done? Employer's Liability Cases, 207 U. S. 463,
28 Sup. Ct. 141, 52 L. Ed. 297; Wabash R. R. v. U. S. (C. C. A.,
7th Circuit) 168 Fed. 1; 9 Columbia Law Review, 38; U. S. v. Colo-
rado, etc., R. R. Co. (8th Circuit), 157 Fed. 321, 85 C. C. A. 27, 15
L. R. A. (N. S.) 167.

Difficult as these problems are, they can and will be solved, and
for the right. Pessimists discourage. However, their statements
that everything is wrong, and will grow worse, must be heavily dis-
counted. Because railway systems reach into many states, and are
units, crossing state lines arbitrarily fixed, a hopeless condition is
not thereby brought about. It is not true, as some say, that each
state can lower the rates to confiscation, as all know who have read
the decisions to any purpose. I believe as firmly as does anyone in
the power and the rights of our general government, and, when the
clashings come as to the power of the state and the general govern-
ment, let the doubts be solved in favor of the government. But as
to some matters there are no doubts, and two of these are that the
Constitution is the supreme law of the land, and that as to all local
matters the states are in control. All should insist upon both.

4. It is contended that the statutes are void because of the excessive
penalties; reliance being based on the case of Ex parte Young, 209
U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932.
Until the decisions in the Minnesota cases (Chicago, M. & St. P.
R. Co. v. State of Minnesota, 134 U. S. 418, and 467, 10 Sup. Ct.
462, 33 L. Ed. 970) it was an open question whether a review of rates
fixed by a Legislature, or a commission acting under a legislative
authority, could be had by the courts. The Minnesota statute au-
thorized a commission to fix certain rates, which rates thus fixed should
be final and conclusive. The Supreme Court of the state adjudged
that such rates were not merely advisory, nor prima facie reasonable,
but conclusive, and not subject to review by the courts. State v.

Chicago, M. & St. P. Ry. Co., 38 Minn. 281, 37 N. W. 782. But the United States Supreme Court reversed that decision, and notwithstanding the strong dissenting opinion by Justice Bradley, concurred in by Justices Gray and Lamar, and Justice Miller hesitating, the question is now at rest, and the courts not only can, but must, determine the question whether such rates are reasonable.

In time the Legislature of Minnesota believed it could in another way make its determination as to rates conclusive and beyond the powers of the courts to interfere. This was attempted by providing penalties for violations, to that which was equal for one week's business to life imprisonment for all officers and agents, and confiscation of all the railway property, if resistance by litigation was made, and such litigation failed. The decision in Ex parte Young followed, the Supreme Court failing to see the distinction between a statute providing that agents should become felons with life imprisonment pronounced, and all corporate property seized and confiscated, if an unsuccessful contest should be made in the courts.

The statute of Missouri of April 15, 1905 (Laws 1905, p. 102 [Ann. St. 1906, § 1194]), covered by the original bills herein, fixes the only penalty for violations by allowing treble damages and a reasonable attorney's fee. Citation of authorities need not be made to sustain such penalties. And in any event that statute has been repealed. The two-cent passenger rate statute of February 27. 1907 (Laws 1907, p. 170). provided for a penalty of not less than $100 nor more than $500. What shall be deemed a complete or separate offense is not defined. The freight rate statute of March 19, 1907 (Laws 1907, p. 171), provides for no minimum penalty, but the same shall be a fine not exceeding $5,000. Imprisonment is not designated under either statute. unless by some general statute for the nonpayment of the fine; while under the Minnesota statute the penalty for each offense was fixed at a fine of not more than $5,000, or imprisonment in the state prison for not more than five years, or both.

This objection to the Missouri statutes is without merit.

5. Evidence is before the court tending to show that a large number of men have been discharged from the service of the railroad companies by reason of the reduction of rates. And this fact is urged as one element that should be considered. It is true, before interest can be paid on the bonded debts, that operating expenses, including labor, and materials largely made up from labor, must be paid. And, as of course, all of these, including interest, must be paid before dividend checks are issued. The states should and usually do attempt to legislate in the interest of laboring men. And if the legislation under consideration is hostile to their interests, the Legislature, and not the courts, have the responsibility. I agree to all that was said in argument in their behalf. I agree that in sobriety, and intelligence, and faithfulness to duty they are surpassed by no other class of men. Their dangers are great, and the people owe them much. But if employés are reduced in number, or now or later on their compensation will be reduced, and if such results are by reason of legislation, then their remedy, if they have one, must be sought elsewhere than in the courts.

6. It is urged in argument that the reduction of rates will impair the service to the public. The charter of a railroad is an implied contract with the state. The company is given such right under such contract to perpetually operate its road. The state agrees that it shall be reasonably and sufficiently remunerated according to the business done. The company agrees to furnish reasonably efficient service. To furnish no service is a complete breach of the contract. To furnish a partial service is a partial breach. What is a reasonable service is a question of fact dependent upon the circumstances of each case.

Thus it is that the Supreme Court has held that in some instances state legislation is valid which requires through and interstate trains to stop at important towns to let off and take on passengers, state and interstate. Mississippi v. R. R., 203 U. S. 335, 27 Sup. Ct. 90, 51 L. Ed. 209; L. S. & M. S. Ry. v. Ohio, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702; Gladson v. Minnesota, 166 U. S. 427, 17 Sup. Ct. 627, 41 L. Ed. 1064. And in other cases such state legislation has been declared invalid. R. R. v. Illinois, 163 U. S. 142, 16 Sup. Ct. 1096, 41 L. Ed. 107; R. R. v. Illinois, 177 U. S. 514, 20 Sup. Ct. 722, 44 L. Ed. 868; R. R. v. Wharton, etc., 207 U. S. 328, 28 Sup. Ct. 121, 52 L. Ed. 230. All those cases turned on the facts, and the question of fact was as to the service the public should have.

Of course, the service rendered and the compensation received should have a proper relation. The expenses incident to, and that can be specifically located in connection with, a particular train, are not all the expenses to be accounted for, as will hereafter be discussed. But it is true that without reasonable compensation there cannot be reasonable service. It is common information that the public in many localities is demanding increased service. But this phase of the question is so indefinitely covered by the evidence, and is so general in the very nature of the question, that no decree can be rendered herein that will cover the proposition.

7. It is urged that these statutes are void because they are not enforceable as to some of the railway companies within the state, and the claim is that, being void as to some, they are void as to all. It is conceded in argument that as to two roads, the St. Louis & Hannibal, and the Kansas City, Clinton & Springfield, the rates fixed are not compensatory. The state's experts agree to this. Usually, statutes fixing rates for railroads to observe, classify the roads according to their earning power, and fix the highest rates for those earning the least. But this was not done, except that railroads of a length not greater than 45 miles, not owned nor leased nor controlled by a trunk line, may charge four cents per mile per passenger. The sole theory upon which rates are adjudged void can only be that the rates are not compensatory, and, to so decree, the court must have the complaint of each and every road making the claim. Complainants have recognized this by their counsel in bringing as many independent actions as there are railroads complaining. Whether there are any other railroads within the state than these 18 complainants, neither the allegations of the pleadings nor the evidence show. Perhaps the court should take judicial notice of whether there are other roads or not.

Be this as it may, the court is not advised. I assume there are no other roads within the state than these 18.

The record shows that two of the cases, those brought by the Rock Island and the St. Louis, Kansas City & Colorado, have been consolidated for trial purposes, the one road having become the owner of the other since the litigation commenced. The record further shows that nine cases were tried, and that the other eight cases were to be covered by decrees the same as decrees in some of the cases tried, the particular cases being designated by the record. All this shows to my mind that complainants' counsel rightly conceived the theory upon which these bills of complaint were presented. The record shows further that before the master there were many attempts for position on both sides as to what cases should be tried, the Attorney General and his associates desiring that the Burlington and two other strong roads having the short lines should be heard, and the others either continued, or that decrees in the other cases should follow the decrees in the cases of the strong roads. Counsel for the railroad companies were desirous of trying the cases brought by some of the other companies, or, at least, that the roads should be classified into three or four classes, but that the court should hear only one case of each class. This emphasizes the theory that was in counsel's minds all the way through this litigation.

In one respect, at least, it seems to me that these statutes should be declared valid or void as the facts may warrant, as has been frequently done with reference to ordinances of cities. The ordinances of cities regulating speed both for trains and teams are declared unreasonable, and therefore not enforceable as to some parts of the city, and valid and enforceable as to other parts of the city not so densely populated. These statutes are not void upon their face. The company which alleges that they are void must make a showing that the rates, considering all the facts and circumstances, are not compensatory as to that particular road, failing in which, the statute will be enforced, and successful in which, as to that particular road the statute will not be enforced.

The case of R. R. v. McKendree, 203 U. S. 514, 27 Sup. Ct. 153, 51 L. Ed. 298, is not in point, because there the question was with reference to an order of the Secretary of Agriculture which was void in part and was not separable, it not being possible to eliminate the valid from the void features.

The Cotting Case, 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92, was decided by reason of an entirely different principle. The statute in that case on its face shows that a company doing little business was not to be regulated, while the company doing much business was made subject to the statute. And by reason of that vice the statute was held void. That the Cotting Case is not in point, see Consolidated Coal Co. v. Illinois, 185 U. S. 207, 22 Sup. Ct. 616, 46 L. Ed. 872; McLean v. Arkansas (January 4, 1909) 211 U. S. 539, 29 Sup. Ct. 206, 53 L. Ed. ——.

The Connolly Case, 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679, was likewise decided, in part at least, because the statute did not ap-

ply to all classes of persons engaged in a like business, and that the statute was not separable, the valid from the invalid.

The case of Ju Toy, 189 U. S. 253, 25 Sup. Ct. 644, 49 L. Ed. 1040, the Trade Mark Cases, 100 U. S. 82, 25 L. Ed. 550, and the recent case of Howard v. R. R., 28 Sup. Ct. 141, 207 U. S. 463, 52 L. Ed. 297, were decided by reason of this same principle, namely, as to whether the statute is separable or not.

Therefore the holding is that these statutes are not void upon their face, and cannot be declared void for the one reason that the evidence shows they are not enforceable as to two or more roads.

8. The state earnings are made known to a certainty, concerning which the experts on both sides agree. And whether in earning them the company gains a profit, or sustains a loss, is dependent upon the expense in making such earnings. Some of these expenses can be definitely specified, but others, like maintenance of way, salaries of all officers, including ticket agents, handlers of freight, terminal expenses, compensation of many laborers, and other things, are all occasioned for carrying both freights and passengers, state and interstate, and miscellaneous of each. And herein is the problem how to make the apportionment.

The track mile, or train or car mile, does not furnish the solution, because every one agrees that neither of those methods will do, and no one of the experts or counsel on either side asks for such a solution. Therefore there is and can be but one of two methods adopted. Neither can be relied upon if mathematical precision is demanded. But the one more nearly correct and satisfactory is the one to be adopted. And that is what is done in litigation concerning injuries and death; the age, earning power, loss of time, can be fixed, some with certainty. How many years the party had before him is fixed by mortality tables, wholly unreliable as to the individual, but fairly certain as to the average.

In taking property under the power of eminent domain, we know the assessed value, the amount of taxes, the rents, and maintenance. Some or all these elements are put in evidence, while all other is matter of opinion, concerning which witnesses and jurors differ. And so it is in most litigation.

9. The theory to now recognize must be either the proportion of earnings, state and interstate, or ton and passenger mile. That it costs more to carry either freight or passengers proportionately for a short than a long haul is undoubtedly true, although all the elements are not more expensive. Local trains generally have poorer and older and cheaper cars and locomotives. But their speed is greater between stations. There are many stops. They carry proportionately much greater dead weight. They do much switching, and there are many delays. Their crews are paid more proportionately to distance and what is carried. The trains are daylight trains only. With freight the car load and number of cars are much the less, and from station to station grows less, and is largely made up of single parcels, boxes, and individual shipments from as many consignors to as many consignees, first put in one station, and at the end of the trip into an-

other station by the company. Usually there are two terminals, comprising an enormous amount of the investments and expenses of the company. The local train is seldom loaded to the capacity of the engine, to the loss of much of the investment and expense. The clerk hire, selling tickets, issuing bills of lading, making expense accounts, and auditing and making records, are attended with like expense for the small and the large items. Many stations would be done away with but for local business.

In nearly every instance enumerated, as to the interstate, which includes transstate, the reverse is true, although much magnified in my opinion as to terminals, and particularly as to transstate, because in my judgment some of the interstate business has two terminal expenses within the state. The two gateways in Missouri through the one or the other of which a large percentage of business, both interstate and transstate, passes, are Kansas City and St. Louis. And at both of those places the investments are very large, and of course, whether owned or rented, the expense is practically the same. But these terminals are for both. And while I believe the terminal expenses at St. Joseph, Kansas City, and St. Louis as to transstate business are minimized, I do not agree with the experts who claimed that there are none of those expenses. Their cross-examination shows this to be a mistake.

But from the great weight of the testimony, it can well be said that the ton mile is not reliable, and the revenue is more nearly correct, as showing that it costs more by 25 per cent. to carry passengers, and 50 per cent. to carry freight locally, than it does when interstate. Generally speaking, this is undoubtedly true. There are exceptions, one of which is shown by the Burlington with its three roads from St. Joseph, the one to Villisca, Iowa, another to Creston, Iowa, and a third to Chariton, Iowa. They are all interstate roads, each with two terminals, but each operating only local and daylight trains. The Wabash illustrates this with roads across the arbitrary state line between Missouri and Iowa. And there are other illustrations, but less noticeable, in the testimony. But all these are exceptions, and the testimony establishes the rule as stated.

The Missouri Legislature has recognized the proposition in all of its rate statutes, and particularly in the statutes now assailed, that it costs more per mile for a short than a long haul. See act approved April 14, 1905 (Laws 1905, p. 104 [Ann. St. 1906, § 1194b]), and the act of April 15, 1905 (Laws 1905, p. 102 [Ann. St. 1906, § 1194]), covered by the original bills herein. The passenger rate statute under consideration fixes a two-cent fare for all trunk lines, and four cents per mile for a road less than 45 miles in length.

The freight rate statute under consideration, in every schedule recognizes the principle that proportionately there should be more charged for a short than a long haul. For instance, class D allows a charge of five cents per hundred for car load lots for the first 25 miles, and one-half cent for the second and additional 25 miles. And commencing with the statute of Pennsylvania of 1846, chartering the Pennsylvania Road, to the present time, every statute upon the subject fixing

freight rates, and many of them fixing passenger fares, recognize this principle. So that, while it is a legislative function to fix rates, we have innumerable legislative recognitions of the greater cost for weight per mile for a shorter than a longer haul, and in some instances as to passengers. And no state has so recognized this to a greater extent than has the Missouri Legislature. And the courts passing upon the question have invariably recognized this as being so, and that the revenue theory is the correct one as against the ton mile.

This was so recognized by the Supreme Court of Pennsylvania in the case of Railroad v. Pennsylvania County, 220 Pa. 100, 68 Atl. 677, 15 L. R. A. (N. S.) 108, but not discussed.

In R. R. Co. v. Tomkins (C. C.) 90 Fed. 363, Judge Carland, of the South Dakota district, in passing on the statutes of that state, said:

"This court believes that it is fair and just to first ascertain what per cent. of the total gross earnings in any one year the total local earnings are for that year, and, having ascertained that per cent., to take the same per cent. of the total value of the property as a fair value upon which to fix local earnings."

The decree was reversed, and, although an equity case, remanded because of a failure to make a material finding. Chicago, M. & St. P. Ry. Co. v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417. The same case, under the title of R. R. Co. v. Smith (C. C.) 110 Fed. 473, on final hearing resulted in a decree enjoining the rates, and the question of expenses was arrived at by the extra cost and on the revenue theory.

The case of R. R. Co. v. Keyes (C. C.) 91 Fed. 47, is an opinion by District Judge Amidon, concurred in by Circuit Judge Thayer, enjoining North Dakota statutory rates. The argument of the opinion condemns the ton mile theory, and adopts the revenue theory. The criticism of the case is that conditions in sparsely settled North Dakota are not like those in this state. But the question of which theory was the more accurate for computation was fully covered, and the ton mile was condemned.

In Re Arkansas R. R. Cases (C. C.) 163 Fed. 141, decided but a few months since by Judge Van Devanter of this circuit, a temporary injunction was issued against the enforcement of the Arkansas statutory freight and two-cent passenger rates. And in most respects the state of Arkansas, with reference to rates, is like that of Missouri, especially the south half of Missouri. Judge Van Devanter, in discussing this question said:

"Other standards are suggested, but the proofs indicate that none of them is as satisfactory or accurate as is the difference in cost in its relation to the revenue."

And the proofs, including statistics and tables and some of the same expert witnesses on each side, were the same as in the cases at bar.

The great case from Nebraska of Smyth v. Ames was heard on the circuit by Justice Brewer on oral testimony, as the cases at bar have been heard. The entire discussion of the question by Justice

Brewer, in a lengthy opinion, is on the extra cost and revenue theory, entirely ignoring the ton mile theory. That case resulted in the state statutory freights being enjoined by Justice Brewer, District Judge Dundy concurring. The case was carried to the Supreme Court (169 U. S. 467, 18 Sup. Ct. 418, 42 L. Ed. 819), resulting in an affirmance of Justice Brewer's decree. The opinion of the Supreme Court by Justice Harlan is exhaustive, and the tables used by him to show the facts, and the entire argument is with reference to the extra cost and revenue theory, utterly ignoring the ton mile theory.

Recurring to the Tomkins Case, 90 Fed. 363, above alluded to, that case was reversed by the Supreme Court (176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417), and the question of fact was only discussed from the revenue theory. The reversal was only because the lower court recited that it was unable to ascertain what was the actual cost of earning the local earnings for certain years. But as the lower court on the first hearing proceeded on the extra cost and revenue theory, and as that was what was discussed by the Supreme Court, and under the mandate the case went to decree (110 Fed. 473) on the revenue theory, I am convinced that the Supreme Court for the guidance of trial courts has adopted the revenue theory as the one more just and equitable both to the patrons of the road and to the companies.

So that we have the Supreme Court in the two cases recognizing the revenue theory. Two Circuit Judges of this circuit have so held. And the same holdings have been made by at least three District Judges, and the Supreme Court of Pennsylvania impliedly, although the argument in that opinion is not strengthened by reason of a statement as to the measure of proof, concerning which the minority opinions without doubt are correct.

As an argument against the revenue theory, and for the ton mile theory, no court has spoken in so far as counsel on both sides and I are advised. In some phases this is a question of fact, or logic, or argument, or opinion, partaking of all. But so many eminent courts have thus spoken, even though not a question of law, and even though the traffic in the states differ, yet such opinions tend most strongly to create an undoubted belief that the cost for carrying both passengers and freight locally is greater proportionately than for doing a long or interstate business, and that the revenue theory is the only one to apportion the cost of each business.

The Wisconsin Railroad Commission made an exhaustive and thorough investigation of these questions two years since. Evidence of both sides was heard. Experts interested, and those not interested, testified. Many months of time were given to the hearing and in reaching conclusions. A valued report was the result. The findings and conclusions were: (1) The cost of carrying local and state freight is greater than for carrying interstate freight and passengers. (2) That this extra cost must be considered, and then take the gross earnings as the basis upon which to allot expenses between the state and interstate business. (3) That less than

2½ cents per mile for local or state passengers was not remunerative in the state of Wisconsin.

10. When the statutes in question were enacted, it was believed by many that by reducing the fare there would be much more travel. For a month or so this proved to be true. But with the novelty gone, the testimony shows that the increase has been less than 3 per cent., and more nearly 1 per cent. It was likewise believed by many that, with the abolition of passes and other forms of free transportation, expenses would be lessened and receipts increased. Ministers sometimes received free transportation, but generally at half rates. Many lawyers and doctors received passes under guise of retainers for services never performed. Bankers received them under the claim that it was compensation for signing bonds and cashing Chicago and St. Louis exchange. Politicians demanded, extorted, and received them for supposed influence. Officials received them as a courtesy. Many newspaper concerns received them, from the proprietor and editor in chief down to the typesetter (relatives included), under the pretense that it was an exercise of liberty of contract, for which the newspaper published the arrival and departure of trains, with an occasional local and sometimes abbreviated plate matter. To receive them was often followed by charges of corruption; and to refuse them, by charges of demagogy. Every person conceded it to be a wrong system, and most people were advocates for its abolition, except as to the class to which he belonged. But it was abolished, and does not longer exist, and the evidence shows that as to state earnings the passenger revenue is increased by reason thereof less than 1 per cent.

11. This leaves but one question for decision, and that question largely one of fact. The question is whether the traffic wholly within the state of Missouri, generally referred to in the evidence as local traffic, can be carried under the freight rate statute of 1907 and the passenger fare statute of 1907 at such profit as will give a reasonable return after paying expenses upon the investment, or whether such traffic is carried at a loss, or less than such reasonable profit.

Thousands of pages of testimony, taking weeks of time, have been filed. This testimony was orally presented, part to the master, and part to the court, accompanied with volumes of statements, reports, schedules, and tables. Every phase of every question of both debit and credit has been worked out, tabulated, and filed. These exhibits are the result of something like one year of work by the expert accountants representing both sides, as a result of their examinations of train reports, waybills, auditors' books, and of the accounts of the passenger and traffic departments of the several roads. This work required not only much time, but energy, and patience, and learning, and great skill. But each side had accountants of the highest character, and possessing all of those qualifications. The four accountants, Mr. Peabody and Mr. Johnson representing the railway companies, and Mr. Taliaferro and Mr. Hamilton representing the state, impressed me, after hearing

them testify and being in consultation with them for 10 days after the cases were submitted, that the sole purpose of their work was to exhibit the truth, differing only as to extra cost, and that difference of extra cost largely confined to the local passenger traffic, and differing as to the theory as to how the expenses between local and interstate traffic within the state should be divided. Aside from those two questions, there is not the slightest variance between the testimony of the experts upon the two sides. During the 10 days following the submission of the cases, they and the court being alone, at the request of the court they prepared a statement in each of the nine cases submitted, which have been ordered filed. To each of the nine statements is appended a certificate showing the time covered, and that such statement correctly shows the results of the various assumptions set forth therein, which certificates were signed by the four expert accountants. Seldom, if ever, is a court under greater obligations to expert accountants representing the two sides than the court and all parties, the railroads and the public, owe these four gentlemen. Usually experts representing different sides do not agree to anything. Here experts representing the different sides agree to everything pertaining to the accounting, the differences only arising as to the basis.

The court is likewise much indebted to counsel on both sides, who for four days argued these cases with a fairness, and wealth of learning, and eloquence seldom displayed at the bar. And now, after the fullest investigation of the record, the court has reached the conclusion that upon this question of fact the statutory rates fixed by either and both statutes are not remunerative. And it only remains for the court to give the reasons for such conclusion. And, in giving these reasons, clearness is added by eliminating those things so clearly established by the evidence, or so nearly conceded in matters of law as not to be debatable.

First. The unquestioned and undoubted rule is that there is a presumption both of fact and of law in favor of the validity of every legislative enactment. The railway companies have the burden of removing this presumption, and showing that the statute clearly, or as some courts say, palpably, and others say, beyond a reasonable doubt, that the statute is invalid. In these cases the court has recognized this rule. The authorities upon this question form a long and unbroken line, with the single exception of the majority opinion in the Pennsylvania case decided a year ago. 220 Pa. 100, 68 Atl. 676, 15 L. R. A. [N. S.] 108. And that one authority is not persuasive.

Second. All testimony and argument bearing upon the question as to what consideration the Legislature of Missouri gave to these enactments is utterly immaterial. Much was said in argument as to the message of Governor Hughes of New York two years ago in declining to approve the two-cent fare statute of that state. Governor Hughes had the moral courage to veto a measure of popular favor because, as he believed, the question had not been fully considered. But the relations of a governor to proposed legislation,

and those of a court to legislation consummated, are entirely different.

Third. Most of laymen and many lawyers believe that the question is whether the railway company as a system is earning sufficient revenue upon the value of the property of the system. They believe that if the Burlington, Santa Fé, Wabash, or any other railroad system is earning such money as will pay all charges and expenses, including taxes and interest, with reasonable dividends to the stockholders, that state rates for state business must stand. Of course, no one believes this who has given the slightest attention to the question. That precise question was before, and was decided by, Justice Brewer (Ames v. Union P. Ry. Co. [C. C.] 64 Fed. 165), and affirmed by the Supreme Court in the Nebraska case of Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. The only question is as to Missouri rates, less expenses properly charged against the same. And, if this balance does not leave sufficient to pay a reasonable return, the law is invalid. And if the railroad system of any company is earning more than a reasonable return by reason of interstate rates, which affect the people many times more than local rates, and if such interstate rates are too high, Congress, either acting alone or through a commission, must make the corrections.

The Supreme Court during the present year, in the case of City of New York v. Consolidated Gas Company of New York, 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. ——, decided that 6 per cent. was fair and right to be given to the owners upon the true valuation. My opinion is that, while a gas plant is in some respects different from a railroad, a railroad property, properly built, and properly managed, should, over and above expenses, make a return of 6 per cent. per annum. And, considering all the evidence, the evidence fairly shows that all of these roads were properly and economically built and are being properly and economically managed, and that, after paying the expenses for maintenance and operation, there is less than 6 per cent. of returns, and not more than 3 per cent. upon any of them, and as to some of them a deficit, taking the property as above stated within the state of Missouri at its fair valuation. And this is so without reference to bonds, because in no case do the bonds bear 6 per cent. interest. But taking the bonds into consideration, there is still not to exceed 3 per cent. returns, and in many cases a deficit, after considering all debits and credits, upon the true valuation for the state business. There is no evidence that any of the existing bonds were improperly issued either as to amounts or rates of interest. In fixing the value the court has considered the evidence of witnesses as to the stocks and bonds outstanding, and the court has considered the evidence of the fact that the Missouri state board for taxing purposes has valued these properties. Of course those findings are not binding nor conclusive, but they are persuasive. But independently of stocks and bonds, and independently of what the state board has valued these properties for taxing purposes, the

evidence shows the valuations to be as recited in the findings of fact herewith filed, and to which reference will be made in the decrees.

It is absolutely necessary that many trains, both passenger and freight, do both a local and interstate business. Even the fast trains stopping at but few stations in the state carry state passengers between such stations. And the same is true as to freight trains carrying freight both in car load and less than car load lots.

The valuation of the roads has been fixed by the court as shown by the findings of fact. The entire state and interstate earnings of each of the roads within the state is known and fixed to a certainty. The expenses are known and fixed. To apportion these expenses, it must be done according to one of the two theories, and the correct theory is that according to revenue. One theory or the other must be applied to both freight and passenger expenses, and the court should not adopt the one theory as to part, and the other theory as to another. The one theory is helpful to the one side, and the other theory helpful to the other side; the one theory to the one side in freight, and the other theory to the other side in passenger. But an arbitrary splitting of theories is illogical and unfair, and cannot be recognized. The court has adopted the revenue theory because a great number of the best railroad experts of the country, against a very limited number to the contrary, have so testified. Every court that has ever had this question before it, in so far as I am advised by the briefs of counsel and my own independent investigation, has so held in the cases hereinbefore cited of the Supreme Court of the United States; in the two cases, by two Circuit Judges of this circuit; by three District Judges of this circuit; and by the Supreme Court of Florida, State v. Atlantic Coast Line, 48 Fla. 146, 37 South. 657. And Beale & Wyman on Railroad Rates Regulation, § 466, announces such as being the correct rule. The values of the property within the state have been fixed by the court. The entire earnings within the state, interstate and state, freight, passenger, and miscellaneous of each, have been fixed. The entire expense is known, including the extra cost of each. To ascertain whether the result is a profit, and if so what per cent., or a loss, is but a problem of primary arithmetic, as is shown by Judge Van Devanter in Arkansas Rate Cases (C. C.) 163 Fed. 141. There are other methods equally simple, the resultant figures of course being the same. These computations show, as to the commodities covered by the freight rate statute of 1907, that two roads, the Hannibal & St. Louis and the Burlington, allowing nothing for extra cost, there is a deficit, and with all other companies less than 2 per cent. But with the extra cost added, the deficit for the two companies is much greater, and the other companies show a deficit.

The passenger earnings under the two-cent fare law of 1907, allowing nothing for extra cost over interstate business, give no return whatever to the Rock Island, St. Louis & Hannibal, Kansas City, Clinton & Springfield, and the Great Western. The other companies will have the following: The St. Louis & San Francisco, between 3 and 4 per cent.; the Santa Fé, between 4 and 5 per cent.;

the Kansas City Southern, a small fraction over 2 per cent.; the M., K. & T., between 2 and 3 per cent.; the Burlington between 3 and 4 per cent. But all this is arrived at by allowing no extra cost of service. But to add the extra cost for freight and passenger, there are no earnings over expenses. This is confiscation under the Constitution.

It being a legislative act, and not a judicial one, this court cannot fix rates. If it could, 2½-cent passenger rates would be fixed for the stronger roads, and 3 for the others. But that is for the Legislature acting itself with experts, such as the state employed in these cases, or through a commission with like assistance.

In view of general equity rules prohibiting findings of fact and other matters from being inserted in decrees, this opinion has been extended. And to further show how the court has considered the cases, and the various questions of fact covered by the voluminous evidence, findings of fact have been made and signed, which will accompany this opinion.

Long and laborious as the work for the court has been, I am of the opinion that the cases have been expedited by hearing the oral testimony as provided by general equity rule 67. It gave the court a much better insight into the intricacies of the cases, and with a much better knowledge of the cases than could be gained by hearing exceptions to a master's report. And I am fully compensated by the belief that I have worked out the correct conclusions, and with the knowledge that if I am in error, either as to fact or law, the cases can be speedily heard de novo by the Supreme Court of the United States. Because I feel in all cases, and in these cases more than ever before, as Judge Sanborn said in Boatmen's Bank v. Fritzlen, 135 Fed. 650, 655, 68 C. C. A. 288, 293:

"Every conscientious judge, every thoughtful man, upon whom is laid the grave responsibility and the heavy burden of determining the rights of his fellows, rejoices in the thought, wherever such is the case, that his decision may be reviewed, and that, if erroneous, it will not work irreparable injustice to him whom he deems it his duty to defeat."

The decrees will be for the complainants. Each party will pay the costs by such party made, except the compensation of the master and stenographer. The half of those will be paid by complainants, and the other half by respondents. The reservation clause usual in such cases will be in the decrees.

### Supplemental Opinion.

These cases are pending on a motion to modify the decrees and opinion filed March 8, 1909.

1. The costs were taxed, the one-half to the railway companies, and the one-half to the state officers. The company being successful, it is contended that the taxable costs, aggregating about $18,000, should all be adjudged against the state officers. In actions at law, in the absence of a tender or statutory offer to confess judgment, the costs follow the judgment. In equity cases, such is the general rule, but not

the invariable one. The award as to costs is discretionary. Two things influenced the court in dividing the costs herein:

First. Defendants are officials, and as officials are representatives. They have no personal interest in the litigation. This, of itself, is not enough to avoid the costs; but it is to be considered. It will be presumed that the Legislature will appropriate a sufficient amount to protect these officers. But this is not always done. The last Legislature appropriated $40,000 for these cases, which was but two-thirds enough for the two years. The master in chancery and the lady stenographer gave a great deal of time, followed by very large, but justly owing, bills, the one half of which has been paid by the railways and by the state nothing, with the appropriation exhausted. Whether the other half is paid all depends upon what the Legislature does.

Second. The more sufficient reason for dividing the costs is because of the extravagantly enormous record made in the cases. The master gave many weeks to taking evidence, and many more weeks were given by the court in taking evidence. Both the master and the court were powerless to abbreviate the record, because the Supreme Court, in the Case of Blease v. Garlington, 92 U. S. 1, 23 L. Ed. 521, and the Circuit Court of Appeals for this circuit, in case of Shubert v. Woodward, 167 Fed. 47, 52, have held that trial courts must receive in equity cases all evidence offered that is germane to the issues. I complained, and in effect gave warning, many times to the parties, but without avail, because of the prolixity of the record. Something like 15,000 pages of evidence were taken, when one-third would have been as strong a presentation of either side. Courts should impose penalties for this, and the only penalty is by way of costs. Both sides were at fault, and both sides should bear the burden. It does not follow that such a precedent will be one to plague. It is not a precedent to be followed, except in cases where it ought to be followed.

2. Complaint is made because of the recital in my opinion that:

"It being a legislative act, and not a judicial one, this court cannot fix rates. If it could, 2½-cent passenger rates would be fixed for the stronger roads, and 3 for the others. But that is for the Legislature, acting itself with experts, such as the state employed in these cases, or through a commission with like assistance."

My statement that "it being a legislative act, and not a judicial one, this court cannot fix rates," is not controverted by any one. This being so, as of course, what I said as above is obiter dictum; but because it is dictum is no reason whatever for not saying it, and still less a reason for now eliminating it from my opinion. The greater part of one of the greatest opinions ever written by the great Chief Justice (Marbury v. Madison, 1 Cranch, 137, 2 L. Ed. 60) was dictum. But, even if it were possible, who would dare to mutilate that opinion? But two years since there were published two very large volumes wholly covering dicta only of the United States Supreme Court. Those dicta were and are binding on no one, but they contain much of the cream of our jurisprudence. This dictum of mine is binding on no one. It is my opinion, and will stand as of value, or of no value, as the profession and informed laymen fix the value thereon. I believed it proper to say that the strong roads should have 2½ cents per passenger per mile

and the weaker roads 3 cents. I could have fairly stated that the St. Louis & Hannibal and the Kansas City, Clinton & Springfield Railroads should have 4 cents or more per passenger per mile.

I still adhere to those views, and, entertaining them, I know of no reason for not stating them, with reasons for believing it was my duty to state them. Passengers, like consumers, have rights. One of those rights is to have fares fixed reasonably low. But the term "reasonable" is a comparative one. It must be in proportion to what it is worth, and the better the service the more it is worth; and the public is entitled to have, with the right to demand, efficient service, provided, always, such is paid for. Much in argument was said by counsel on both sides as if an arbitrary flat rate is all that is involved, regardless of service, and regardless of all other things. Whether the trains are expensive or inexpensive, daylight or night trains, through or local trains, main line or branch trains, roads through the hills of central Missouri, or the Ozarks, or over the prairies, and whether the trains carry few or many passengers, are matters largely passed over as if of no importance. To me they seem of great importance. So it is as to the greatly increased cost of materials compared with 10 years ago. The average fare paid per year, aside from the low excursion rates, is less than $6 per year, commercial travelers excepted. To reduce that to $4, thereby saving $2, is, of course, of importance. So are other matters of importance. Aside from having efficient service, to be paid for at remunerative rates, the laboring men, the employés, have rights. They have the right to be well paid for their work, in daytime and nighttime, sunshine and storm, during the excessive heat of the summer and the rigors of winter. Their hazardous and most dangerous service entitled them to remunerative compensation, which they cannot have with meager earnings of the roads. Evidences of humanity and kindly feeling for their fellow men need not be wholly displayed toward the men who pay $6 per year for passenger fares. A kindlier disposition would suggest an equitable division of sympathy. Thousands and thousands of them have already been "let out" because of decreased earnings, and more are to follow, with diminished compensation for those from necessity retained. What is the truthful answer to make these men, and who is to make this answer? It is doubtful if the Legislature thought this out. I decline to modify my opinion as respects this.

3. It is contended that the court was in error in its original opinion, in that the penalties of the statutes render them void. Whether rates prescribed by statute are valid or invalid is a judicial question, and the Legislature cannot prohibit the courts from passing thereon. This was so stated in the Minnesota Milk Case, 134 U. S. 418, 10 Sup. Ct. 462, 702, 33 L. Ed. 970; and this cannot be done indirectly, by imposing such penalties as to terrorize the company, its officers and agents, so that they do not dare to litigate the question. This was so held in Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, but a year ago. This question received but little attention from any of the counsel or the court, and was but briefly discussed by the court in the opinion. In the Consolidated Gas Case (C. C.) 146 Fed. 150, Circuit Judge Lacombe held that a penalty of

$1,000 for each charge for gas in excess of the statutory or commission rate was prohibitive, and a denial of the right to go into the courts; and on the final hearing of the same case in 157 Fed. 849, 881, a like holding is made; and in the same case on appeal the Supreme Court held a year ago that the penalties were so excessive as to be void. 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. ——. The discussion by Justice Brewer, speaking for the court, in the case of Cotting v. Kansas City Stock Yards, 183 U. S. 79, 99, 22 Sup. Ct. 30, 46 L. Ed. 92, is to the same effect, although the question was not decided; and a like discussion, with a like putting the question aside without a decision, is found in the Reagan Case, 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014. And in Ex parte Young, although the penalties were more severe than under the Missouri statutes, the question is at rest. The sole question is: Can a party be allowed to litigate a disputed question of fact as to property rights, without confiscation of all its property, and all of its agents being sent to jail, if the case is lost? Surely he can. Upon reflection, and with much additional consideration, the holding now is that the section imposing penalties is void. But this is largely an academic question, for the reason that the penalty section is easily separated from the main features of the statute; and I need not discuss the proposition that, when separable, the void section does not render the entire statute void.

4. These cases as to freight were brought four years ago. Two years ago supplemental bills were filed, bringing forward the new freight rate statute and the passenger rate statute. Upon a hearing, by agreement of counsel on both sides, a temporary injunction was issued against the enforcement of the freight rate statute. The railways asked for a temporary injunction against the enforcement of the passenger rate statute. The Attorney General and his associates contested this, and were successful to the extent that the court ordered an observance of the statute for some months, until information from actual tests could be made; so that, from the very inception of the case, it has been contended on the one side that the statute is invalid and on the other side that the statute is valid. It therefore follows that this court has had jurisdiction for four years over all the parties and over the entire subject-matter of state earnings.

It is clear that this court, having such jurisdiction, should retain it over all the parties, and the subject-matter, to the end that the decrees hereafter may be enlarged, or modified, as varying circumstances and the acts of the parties may require. Therefore the decrees should be so changed as to recite such reservations.